## BROWN v. UNITED STATES.[*]

(Circuit Court of Appeals, Fifth Circuit. February 12, 1919.)

No. 3232.

1. CRIMINAL LAW ⊜242(1)—FEDERAL COURTS—TRIAL OF CAPITAL CASES IN COUNTY OF OFFENSE.

Judicial Code, § 40 (Comp. St. § 1022), providing that capital cases shall be tried in the county where the offense was committed, where that can be done without great inconvenience, does not contemplate a transfer of the cause to another court, but a trial by the same court in the county where the offense was committed, and the court where the indictment was found does not lose jurisdiction by ordering such a transfer for trial.

2. CRIMINAL LAW ⊜113—CAPITAL CASES IN FEDERAL COURTS—WHERE TRIABLE.

Judicial Code, § 40 (Comp. St. § 1022), providing that capital cases shall be tried in the county where the offense was committed, "where that can be done without great inconvenience," does not give a defendant an absolute right to trial in such county, but the matter rests in the discretion of the court.

3. INDICTMENT AND INFORMATION ⊜86(2)—OFFENSES WITHIN FEDERAL JURISDICTION.

An indictment charging commission of an offense on a parcel of land described by metes and bounds, alleged to have been acquired with the consent of the state for "public purposes" by the United States and to be under its exclusive jurisdiction, *held* sufficiently specific under Criminal Code, § 272 (Comp. St. § 10445), to give jurisdiction to a federal court.

4. CRIMINAL LAW ⊜304(14)—JUDICIAL NOTICE—OFFENSES WITHIN FEDERAL JURISDICTION—PLACE OF OFFENSE.

Where an indictment in a federal court sufficiently described the place where the offense was committed, the court will take judicial notice of facts which vest the United States with exclusive jurisdiction over such place.

5. CONSTITUTIONAL LAW ⊜62—DELEGATION OF LEGISLATIVE POWER.

Rev. Civ. St. Tex. 1911, art. 5275, authorizing the Governor, on application therefor, to cede exclusive jurisdiction to the United States over lands described in the application and acquired by the United States for certain specified purposes, operates as a blanket consent by the Legislature to such cession, leaving to the Governor only the power to determine when the specified conditions exist, and is not a delegation to him of legislative power.

6. CRIMINAL LAW ⊜1169(1)—HARMLESS ERROR—OFFENSES WITHIN FEDERAL JURISDICTION—EVIDENCE.

In a prosecution for murder committed on land alleged to be within the exclusive jurisdiction of the United States, where the land is described and shown by oral testimony to have been in the exclusive possession of the United States at the time, it was not necessary to prove its title, and introduction of title documents and deeds, could not have injured defendant, whether technically proven or not.

7. HOMICIDE ⊜118(1)—SELF-DEFENSE—DUTY TO RETREAT.

One attacked by another with a knife, not in his own house or on his own premises, is justified in fatally shooting his assailant only where apparently he cannot avoid his own injury by retreating.

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 250 U. S. ——, 39 Sup. Ct. 494, 63 L. Ed. ——.

In Error to the District Court of the United States for the Southern District of Texas; William B. Sheppard, Judge.

Robert B. Brown was convicted of murder, and brings error. Affirmed.

James R. Dougherty, of Beeville, Tex. (G. R. Scott and Boone & Pope, all of Corpus Christi, Tex., and Dougherty & Dougherty, H. S. Bonham, and James F. Odem, all of Beeville, Tex., on the brief), for plaintiff in error.

John E. Green, Jr., U. S. Atty., of Houston, Tex. (John R. Beasley, of Beeville, Tex., on the brief), for the United States.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. The plaintiff in error was tried and convicted of the murder of one James P. Hermes and sentenced to a term of 15 years in the Atlanta penitentiary for the crime of murder in the second degree. From the judgment of conviction the defendant sued out this writ of error.

The plaintiff in error has assigned 54 errors on the record. Instead of taking up the assignments seriatim, it will serve the ends of brevity and clearness to group them according to the various questions they present.

[1] The first group insisted on in argument relates to the preliminary questions as to whether the defendant was properly tried in Nueces county, Tex., instead of in Bee county, the county in which the offense was committed, and as to whether the court below, at the time of the trial, still retained jurisdiction of the cause.

Section 40 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1100 [Comp. St. § 1022]) provides that—

"The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience."

Under this section the defendant applied to the District Judge for a trial in Bee county, and the court granted the application, and ordered the case set down for trial at Beeville, the county seat of Bee county, at a special term. The special term was not held. Before the case was again set for trial, the District Judge died. The case thereafter came up for hearing at Corpus Christi before Hon. W. B. Sheppard, who had been designated to sit in the Southern district of Texas. The court, on motion of the district attorney, dismissed the pending indictment, under which the order for a trial at Beeville had been made, and the grand jury then returned a new indictment, identical in substance with the old one. The defendant objected to the dismissal of the first indictment. The propriety of the dismissal, however, is not open to question. 12 Cyc. 374. Nor could any injury have resulted to the defendant from being tried under the new indictment, unless for the reason that the court had lost jurisdiction of the offense, as contended by defendant, before the grand jury returned the second indict-

ment, by reason of the order of the District Court changing the place of trial from Corpus Christi to Beeville.

The transfer of a cause from one court to another, properly effected, would undoubtedly divest the original court of further jurisdiction, as was the case in Smith v. Commonwealth (Ky.) 25 S. W. 107, relied upon by the plaintiff in error. In the instant case, there was no transfer from the original court to another. The prosecution was instituted in the District Court of the United States for the Southern District of Texas, Corpus Christi Division, and remained in that court until conviction and sentence. Section 40 does not contemplate a transfer of the cause to another court, but only a trial by the same court in the county where the offense was committed. The District Court in which the first indictment was returned did not part with jurisdiction over it by ordering a trial at Beeville, and, even if the subsequent trial had been had under the first indictment, the District Court sitting at Corpus Christi would have had jurisdiction to there try it. The dismissal of the first indictment and the return of the second was authorized, but, in any event, the defendant suffered no prejudice from being tried under the second indictment, instead of the first.

[2] After the return of the second indictment, the defendant reinterposed his request for a trial in Bee county, which, after a hearing, was denied. Section 40 of the Judicial Code does not confer upon a defendant an absolute right to a trial in the county where the offense was committed, but only a qualified right in cases where such a trial could be had "without great inconvenience." The District Court is vested with discretion in making this determination. The trial judge, after a hearing, determined that a trial could not be had at Beeville without great inconvenience, for reasons recited in the order, and which do not show any abuse of discretion, if, indeed, they are not sufficient. Nothing less than an abuse of discretion would justify an interference by this court on appeal.

[3] The second question, insisted upon by the plaintiff in error, relates to the sufficiency of the indictment on which the defendant was tried, and under which he was convicted. It is questioned for failing to sufficiently describe the locality where the alleged murder was committed to give a federal court jurisdiction. Jurisdiction in the federal court was claimed by the government under the following part of the third subdivision of section 272, chapter 11 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1142 [Comp. St. § 10445]):

"Or any place purchased or otherwise acquired by the United States by consent of the Legislature of the state in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

The indictment alleged that the United States acquired in Beeville, Bee county, Tex., a parcel of land for the public purpose of the United States, described by metes and bounds; that, prior to the date of the commission of the offense, constitutional and exclusive jurisdiction over the site of said parcel of land was ceded to the United States by the state of Texas in the manner provided by law; and that, from the date of the cession until the time of the finding of the indictment, the said parcel of land was under the exclusive jurisdiction of the

United States, and was so on May 7, 1917, when the offense was there committed.

The indictment is criticized because it fails to allege the character of public use for which the parcel of land was acquired and used by the government. It may be conceded that the third subdivision of section 272 of the Penal Code confers no right on the United States to accept a cession of jurisdiction from a state for other than the purposes set out in section 272. For the purposes of this case, the use must have been for a "needful building." Exclusive jurisdiction of a tract used for a purpose other than one of the named statutory purposes would be unauthorized. The site was, in fact, acquired for a post office, but the indictment avers only that it was acquired for public purposes. It is contended that this is a fatal defect, because the locality of the offense was jurisdictional, and the indictment must show jurisdiction on its face. The indictment does identify the tract on which the crime is alleged to have been committed by describing it by metes and bounds, and also by alleging the date of the cession of jurisdiction by the state of Texas to the United States. The defendant was fully informed as to the locus of the alleged offense and the claim of exclusive federal jurisdiction arising from it, and it is difficult to see how he could have been prejudiced by the imperfect averment, if there was one, and why it should not, therefore, within the terms of section 1025, R. S. (Comp. St. § 1691), be deemed sufficient.

[4] Again, the place being sufficiently described, if the court judicially notices its character, then neither averment nor proof of it would be essential. In the case of Jones v. United States, 137 U. S. 202, on page 212, 11 Sup. Ct. 80, on page 83 (34 L. Ed. 691), the Supreme Court said:

"Who is the sovereign, de jure or de facto, of a territory is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances."

And again, on page 214 of 137 U. S., on page 84 of 11 Sup. Ct. (34 L. Ed. 691), the court said:

"All courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer, or of its recognition or denial of the sovereignty of a foreign power, as appearing from the public acts of the Legislature and executive, although those acts are not formally put in evidence, nor in accord with the pleadings."

In that case it was held that an executive proclamation that the island of Navassa, on which a murder was charged to have been committed, appertained to the United States by determination of the President, was basis for the court's taking judicial notice that it was a place under the sole and exclusive jurisdiction of the United States. In this case exclusive federal jurisdiction depended upon a written application by the United States to the Governor of Texas for a cession of jurisdiction, the cession by the Governor of such jurisdiction and its acceptance by the United States. In line with the case cited, we hold that

the federal courts take judicial knowledge of the documents mentioned and of the character of the place described in the indictment, as to jurisdiction resulting from them. In the case of Holt v. United States, 218 U. S. 245, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138, the Supreme Court said of an indictment, which alleged that an offense was committed "within the Ft. Worden military reservation, a place under the exclusive jurisdiction of the United States":

> "The indictment is well enough. The words quoted at the outset convey with clearness sufficient for justice that the Ft. Worden military reservation was under the exclusive jurisdiction of the United States at the time of the murder."

The case of Benson v. United States, 146 U. S. 325, 330, 331, 13 Sup. Ct. 60, 36 L. Ed. 991, is to the like effect.

Again, we think the averment that "on the 21st day of September, A. D. 1915, constitutional and exclusive jurisdiction over the site of said lot, tract and parcel of land was ceded to the United States of America by the said state of Texas in the manner provided by law," is a sufficient averment of a cession for one of the purposes enumerated in the third subdivision of section 272 of the Penal Code, and which authorize the United States to accept such a cession, upon the principle that public acts of public officials are presumed to be rightly executed. The application for the cession, the cession, and its acceptance were acts done by the respective federal and state officials in the line of their official duties, and are presumed from the cession and its acceptance to have been properly done, especially when, as in this case, possession and exercise of jurisdiction follow the grant. 12 Cyc. 389.

[5] Article 5275 of the Revised Civil Statutes of Texas (1911) authorized the Governor, upon written application being made to him for that purpose by the United States, accompanied with proper evidence of the acquisition by the United States "for any of the purposes and in either of the modes authorized by this title" of lands, which are described therein by metes and bounds, to cede exclusive jurisdiction over such lands to the United States. That title (article 5275) authorizes the United States to acquire lands in Texas as sites on which to erect and maintain postoffices. When the Governor executes the cession, it will be presumed that the requirements of that act (R. S. Texas 1911, arts. 5252, 5275, 5276) and of the United States Penal Code have been complied with.

The plaintiff in error also questions the authority of the Governor, under the general power conferred by article 5275, supra, to cede jurisdiction in specific instances without legislative direction in each specific case. We do not agree that article 5275 delegates legislative power to the Governor. The blanket consent of the state is contained in article 5275 for all government-acquired lands, upon certain terms and conditions. The Governor is empowered to determine when the conditions that make the legislative consent applicable have occurred. That there is no unconstitutional delegation of legislative power to the executive in this is consistent with the holding of the Texas Court of Criminal Appeals in the case of Baker v. State, 47 Tex. Cr. R. 482, 83 S. W. 1122, 122 Am. St. Rep. 703, 11 Ann. Cas. 751, and of the

Supreme Court of the United States in the case of Field v. Clark, 143 U. S. 649, 694, 12 Sup. Ct. 495, 36 L. Ed. 294.

[6] The plaintiff in error also assigns error based upon the action of the District Court in permitting certain deeds and other muniments of title to go to the jury without proper proof of their execution. The United States was in possession, through contractors, engaged in excavating for a post office, of the land where the murder was committed, when it was committed. The defendant himself was a contractor under the government, and claims to have been rightfully on the premises, when he killed Hermes, by virtue of that relation to the government. The witnesses orally described the place of the killing as the post office site. In this state of the record, the government was not required to prove its title, as in an action of trespass, and the introduction of the deeds and title documents could not have injured the defendant, whether technically proven or not. In the case of Holt v. United States, 218 U. S. 245, 251, 31 Sup. Ct. 2, 6 (54 L. Ed. 1021, 20 Ann. Cas. 1138), the Supreme Court said:

"Several objections were taken to the admission and sufficiency of evidence. The first is merely an attempt to raise technical difficulties about a fact which no one really doubts, namely, that the band barracks, the undisputed place of the crime, were within the exclusive jurisdiction of the United States. A witness testified that they were within the inclosure of Ft. Worden under military guard and control, from which all unauthorized persons are excluded, and that he knew that the fence was coincident with the boundaries shown on a map objected to, but admitted. He identified the band barracks as described in certain condemnation proceedings. The state of Washington had assented by statute to such proceedings and Congress had authorized them. The deeds and condemnation proceedings under which the United States claimed title were introduced. The witness relied in part upon the correctness of official maps in the Engineers' Department made from original surveys under the authority of the War Department, but not within his personal knowledge, and he referred to a book showing the titles to Ft. Worden compiled under the same authority. The documents referred to are not before us, but they properly were introduced, and so far as we can see justified the finding of the jury, *even if the evidence of the de facto exercise of exclusive jurisdiction was not enough, or if the United States was called on to try title in a murder case.* We think it unnecessary to discuss this objection in greater detail."

[7] Another group of assignments of error present the correctness of the rulings of the District Court upon the applicable law of self-defense. The District Judge charged the jury that the defendant might owe the deceased a duty to retreat under certain conditions, though the deceased was approaching him with a knife in his hand. The plaintiff in error's contention limits the duty to retreat to cases in which the deceased assaults his slayer without a deadly weapon. A tendency of the evidence was to the effect that the deceased, Hermes, approached defendant with an open knife in his hand, with which he attempted to strike defendant. The evidence without conflict showed that the defendant, on the approach of Hermes, retreated 20 or 25 feet to where he had left his raincoat, in which was his pistol, and, after obtaining his pistol from it, stood his ground, using his pistol with fatal effect on Hermes. The defendant was rightfully where he was at the time of the quarrel, but was not on his own premises. These facts make

pertinent the question whether one who is assailed by another with a deadly weapon is under all circumstances excused, by that circumstance, from any duty to retreat from his assailant, if himself without fault in provoking the assault.

This is the contention of the plaintiff in error's counsel urged in an able argument and brief. We are not convinced by it that there is a hard and fast rule that he who repels an assault made by another with a deadly weapon may, because of the character of the weapon used by his assailant, repel force with force to the extent of taking life, without retreating, though he could retreat with safety to himself. In the case of Beard v. United States, 158 U. S. 550, 15 Sup. Ct. 962, 39 L. Ed. 1086, the Supreme Court held that one who was assaulted on his own premises, though not in his dwelling house, could repel the assault to the extent of taking his assailant's life, if necessary, without retreating. In the case of Alberty v. United States, 162 U. S. 499, 505, 16 Sup. Ct. 864, 40 L. Ed. 1051, the Supreme Court held that one who killed another, who, in the nighttime, was endeavoring to enter the window of a room, in which was his wife, and who, upon the approach of the defendant, threatened to kill him, and made demonstrations to that end, was justified in killing the deceased, without retreating to avoid doing so. In the former case, the Supreme Court quotes from cases in other jurisdictions, and apparently with approval, the language of the opinions in which would indicate that the duty of one to retreat, when violently assaulted, had no place in modern criminal law. However, in the subsequent case of Allen v. United States, 164 U. S. 492, 497, 17 Sup. Ct. 154, 156 (41 L. Ed. 528) the Supreme Court held the charge of the trial court to be correct, which contained this language:

"The law of self-defense is a law of proportions as well as a law of necessity, and it is only danger that is deadly in its character, or that may produce great bodily harm, against which you can exercise a deadly attack. If he is attacked by another in such a way as to denote a purpose to take away his life, or to do him some great bodily harm from which death or permanent injury may follow, in such a case he may lawfully kill the assailant. When? Provided he use all the means in his power otherwise to save his own life or prevent the intended harm, *such as retreating as far as he can, or disabling him without killing him, if* it be in his power. The act coming from the assailant must be a deadly act, or an act that would produce great violence to the person, under this proposition. It means an act that is hurled against him, and that he has not created it, or created the necessity for it by his own wrongful, deadly or dangerous conduct—conduct threatening life. *It must be an act where he cannot avoid the consequences. If he can, he must avoid them, if he can reasonably do so with due regard to his own safety.*"

## Of this charge, the Supreme Court said:

"Nor is there anything in the instruction of the court that the prisoner was bound to retreat as far as he could before slaying his assailant that conflicts with the ruling of this court in Beard v. United States, 158 U. S. 550 [15 Sup. Ct. 962, 39 L. Ed. 1086]. That was the case of an assault upon the defendant upon his own premises, and it was held that the obligation to retreat was no greater than it would have been if he had been assailed in his own house. So, too, in the case of Alberty v. United States, 162 U. S. 499 [16 Sup. Ct. 864, 40 L. Ed. 1051], the defendant found the deceased trying to obtain access to his wife's chamber through a window, in the nighttime, and

it was held that he might repel the attempt by force, and was under no obligation to retreat if the deceased attacked him with a knife. *The general duty to retreat, instead of killing, when attacked, was not touched upon in those cases.* Whart. on Homicide, § 485."

It is true that the assault on the defendant in the Allen Case, as shown by the statement of facts on a former appeal, was not made with a deadly weapon; but the Supreme Court assumed, as did the trial court, that the facts in the record showed it might have been made under circumstances that created a necessity for repelling it, either without retreating or only after having retreated, as the jury might infer. The general rule as to the duty of retreat is set out by Wharton in the section cited by the Supreme Court as follows:

"In case of personal conflict, it must appear, in order to establish excusable homicide in self-defense, that the party killing had retreated, either as far as he could, by reason of some wall, ditch or other impediment, or as far as the fierceness of the assault would permit him. * * * The true view is that a 'wall' or 'ditch' is to be presumed whenever retreat cannot be further continued without probable death, and when the only apparent means of escape is to attack the pursuer. And retreat need not be attempted when the attack is so fierce that the assailed, by retreating, will apparently expose himself to death."

When the person assaulted is not on his own premises or in his own house, and is not engaged in preventing an independent and forcible felony, but, while engaged in a personal and unprovoked conflict, is seeking to defend his own life, we think the proper rule is that, before repelling force with force, to the extent of taking life, he must retreat to avoid injury to himself, provided that he can retreat with reasonable safety to himself, unless the circumstances are such as would lead a prudent man reasonably and in good faith to believe that, contrary to the facts, retreat would bring upon him danger to his life or limb. This issue is to be determined by the jury from all the attendant facts, and does not depend upon the existence of one alone, for illustration, the use by the assailant of a deadly weapon. It is manifest that an assault with a knife, as distinguished from a gun, might be made from such a distance as that the person assaulted could by retreat escape with no risk. The law, in its tenderness for human life, does not authorize the taking of life to repel such an assault.

An assault without a deadly weapon, because of great disparity of strength, might become fatal if the assailant closed with his adversary. If the manifest purpose of the strong assailant was to kill or rape, then the weak person assaulted might be able to attain safety only by repelling it from a distance, by shooting the assailant. We think it clear that the Beard and the Alberty Cases are exceptions only to a general rule, which requires retreat where, in fact and appearance, retreat is safe, and that the general rule applies to the facts of this case. The deceased approached the defendant in the daytime from a distance. If he had a weapon, it was a knife only, and not formidable at a distance. The defendant had time to, and did, retreat 25 feet, to get his pistol. If the jury believed that he could, by further retreat, have avoided injury, and that a reasonably prudent man would have drawn this conclusion from the circumstances and character of the assault, then it

was the defendant's duty to have retreated, and, failing to do so, he is not to be excused for killing the deceased. The court was not in error in imposing this limited duty of retreat upon the defendant.

The charge of the court is criticized for not defining a deadly weapon. It contains a definition of that term which we think sufficient. The court's charge left to the jury to determine which was, in fact, the fatal shot of the four fired by the defendant, and permitted the jury to acquit the defendant of responsibility for murder because of the fourth shot, if they found that the third was the only fatal one. The charge is also criticized because of the asserted repeated references to the duty to retreat contained in it. We do not think there was unwarranted iteration in this respect. There was a portion of the charge that omitted reference to the element of apparent, as distinguished from actual, danger to be apprehended from the alleged assault on defendant by the deceased. No exception was reserved to this part of the charge separately, and no ground of exception to the charge in its entirety covers the point. The charge, in other portions, covered the doctrine of apparent danger. The omission in the part complained of would doubtless have been supplied, if the court's attention had been directed to it before submission to the jury. No reversible error can be predicated upon an omission, first complained of after verdict. We think the charge of the court fairly covered the law of the case.

The plaintiff in error assigns the refusal of a number of special requests to charge. Of them, without specific reference to each, we may say that those that asserted correct legal propositions were substantially charged in the general charge of the court.

Finding no reversible error in the record, the judgment is affirmed.