**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Fletcher R. BENSON and William P.
Wright, Defendants-Appellants.**

**No. 72–3604.**

United States Court of Appeals,
Fifth Circuit.

June 5, 1974.

Rehearing Denied July 9, 1974.

George B. Azar, Montgomery, Ala. (Court-appointed), for Wright.

Fletcher R. Benson, pro se.

Ira DeMent, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

We review on a consolidated joint appeal the convictions of Benson and Wright for violation of Title 18 U.S.C. Sec. 2111, robbery committed within the special maritime and territorial jurisdiction of the United States.[1] Two additional codefendants named in the indictment, Herman Thomas and Joyce Louise Calhoun plead guilty on the eve of trial, November 6, 1972 and testified as government witnesses in the ensuing separate trials of first Benson, then Wright, conducted in immediate sequence November 8 and 9, 1972. Despite the fact that the defendants were tried separately below, most of the errors claimed are substantially duplicated and accordingly receive joint treatment in this opinion. We will appropriately identify the instances where our discussion applies only to the contentions of a single appellant. Unpersuaded that prejudicial error occurred in either trial, we affirm.

## FACTS

In view of the nature of the claims of error raised the facts require discussion in some detail. In Benson's trial the United States relied on four witnesses: Michael Lock, the robbery victim under Count II of the indictment, Herman H.

---

1. Defined in Title 18 U.S.C. Sec. 7. Sec. 7(3) is the subsection applicable to military reservations.

Thomas and Joyce Louise Calhoun, the co-defendants who had previously plead guilty, and F.B.I. special agent Nicholson, who testified to an oral statement taken from Benson. In Wright's trial the prosecution used the same witnesses, with the exception that F.B.I. special agent Carroll testified regarding a written statement signed by Wright. The other victim, Harrell, did not testify in either trial.

Michael R. Lock and Marvin E. Harrell were white enlisted men in the United States Army stationed at Fort Rucker, Ala. They left the military reservation on February 1, 1972 to shop in nearby Daleville, Alabama, each purchasing some clothing. As they walked back to their Company in the late afternoon within the reservation three black males dressed in Army fatigues[2] and one female in a passing 1963 two-door Chevrolet offered them a ride. Lock and Harrell accepted the ride inasmuch as they still has some distance to traverse. Lock sat in the front seat, Harrell in the back. The driver of the car did not stop when requested as they reached the Company. Lock testified that when this occurred he attempted to get out of the car. At this point a bayonet was put to Lock's throat and his wallet was demanded of him. He had $80, but managed to extract and keep a $20 bill in the process of relinquishing the wallet. This bill was later taken by Benson. Lock said he heard one of the occupants of the back seat demand Harrell's wallet from him. The robberies were committed while the car and occupants were still on the Ft. Rucker military reservation.

The victims were driven off the reservation and ultimately over a dirt road to a bridge where both were physically removed from the car and violently thrown or pushed off the bridge into the water below. The appellant Benson was identified by Lock as the driver of the car. The car left, the occupants taking with them also the clothing the two victims had purchased in Daleville. Lock and Harrell struggled out of the water and went to a farmhouse nearby. From there they telephoned the military police at Fort Rucker. Alabama State Troopers arrived and transported Lock and Harrell to the Daleville Police Station, from which place Ft. Rucker C.I.D. personnel returned them to the military reservation.

While Mr. Wells of the C.I.D. was interviewing Lock and Harrell at the fort, he was contacted by the Daleville police with further information as to the robbery. The police had detained Benson, Wright and Calhoun, all of whom they suspected were occupants of the robbery car. The police wanted the victims to confront the suspects for possible identification. Lock and Harrell, upon being taken back to the police station, were directed to enter a room where the three suspects were detained and to observe them. They complied, and upon leaving the room stated that they were unable to identify any of the three. Benson and his two companions, Joyce Calhoun and William P. Wright, were thereupon released by the local police.

On February 8, 1972, four persons were arrested in Panama City, Florida, following an automobile accident. It was then learned that the four were sought by military authorities at Fort Rucker in connection with the robbery of Lock and Harrell. F.B.I. agents interviewed Benson and Wright at Panama City and obtained photographs of each. On February 15, 1972, Lock identified a photograph of Benson from a collection of nine pictures as one of the people who had robbed him. These included pictures of Benson, Wright, Herman Thomas, Joyce Calhoun and five others. He also identified Herman Thomas, one of the defendants who later plead guilty and testified in the two trials below.

2. The three males were also enlisted men stationed at Ft. Rucker. Benson and Wright both had served in Vietnam, Benson three tours.

## WAIVER OF COUNSEL and SUBSEQUENT INCRIMINATING STATEMENTS

Circumstances surrounding the February 8, 1972, post-arrest interviews with Benson and Wright give rise to several claims of error by each. Both Benson and Wright at the time of the interviews signed forms indicating waiver of their constitutional rights after being fully informed of them. At the hearing on the appellants' motions to suppress the waiver forms, the trial court determined that each defendant had voluntarily, knowingly, and understandingly waived his right to have counsel present. The oral statement made by Benson to F.B.I. special agent Nicholson was admitted into evidence. Defendant Wright's oral statement to F.B.I. special agent Carroll was summarized by the agent in writing and signed by Wright. This written statement was received in evidence at Wright's trial, along with Wright's signed waiver form, and was sent to the jury room during the jury's deliberation. The Benson jury was likewise allowed to have Benson's executed waiver form during its consideration of a verdict.

■ Appellants both contend that, contrary to the finding of the lower court, their waivers were constitutionally invalid because of lack of the advice and assistance of counsel. Put another way, they argue that one cannot waive the right to counsel without the assistance of counsel in making such a grave decision. As legal authority for the position, appellants cite dicta regarding the need for counsel at all "critical" stages in the criminal justice process from several places in the *Gideon* opinion.[3] Appellants seek an extension of the *Gideon* right to counsel at trial such that counsel would be *mandatory* at any point at which an accused must exercise a choice as to whether or not he wishes to exercise such a right. While this position might have had arguable

weight immediately after *Gideon* was decided, the Supreme Court made very explicit the precise dimensions of the right to counsel in *Miranda*.[4] *Miranda* with its positive guidelines, was the logical place for the exposition of the theory advanced by appellants that the Constitution requires the presence of counsel every time an accused waives the right to counsel. If the Court ever entertained such views, *Miranda* we think required an explication of them. The rule in this Circuit has been and remains in accord with this view. United States v. Ogle, 5 Cir. 1969, 418 F.2d 238, 239; United States v. Venere, 5 Cir. 1969, 416 F.2d 144; Gilpin v. United States, 5 Cir. 1969, 415 F.2d 638. No error was committed by the admission in evidence of the signed waiver forms and of the incriminating statements made by appellants after waiver.

■ Appellants urge also that the trial court erred in permitting the signed waiver forms to be sent out with their respective juries. The point advanced is that the forms were merely secondary or qualifying evidence which received undue and hence prejudicial importance by their presence during the juries' deliberations. No authority is cited to support this proposition and we know of none. Prejudicial error is not made to appear in respect to these actions of the trial court.

■■ Finally, Wright contends that as to him it was error for the trial court to permit the written summary of his statement to Carroll to be sent to the jury room while the jury deliberated, saying that it "allowed special agent Carroll to accompany the jury into the jury room." Our decision in United States v. Brown, 5 Cir. 1971, 451 F.2d 1231 is cited to support this position. We disagree upon two grounds. First, *Brown* concerned violation of the hearsay rule as applied to government memoranda and documents allowed to go to the jury room. Here we deal with a

---

3. Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

4. Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

written summary of what the appellant himself told the agent, signed by Wright as attesting to its accuracy. Second, the record makes clear that the document was received in evidence and thereafter delivered to the jury only because defense counsel had used it extensively in his cross-examination of Carroll. During the agent's direct testimony the prosecution did not proffer the document. It was offered later in view of the nature of the cross-examination. The point is that the defense may not create error by forcing the government to introduce evidence, only to complain on appeal that such evidence was prejudicial.

## THE MOTION TO CONFER WITH A GOVERNMENT WITNESS

█ At arraignment, all four of the original defendants entered pleas of not guilty. Defendants Herman Thomas and Joyce Louise Calhoun as above set forth changed their pleas to guilty on the eve of trial. They were identified as prospective government witnesses in the upcoming trials of Benson and Wright. Defense counsel then requested permission to confer with Joyce Louise Calhoun. The witness refused to speak with him. Defense counsel then sought by motion to have the court direct the witness to confer, but the witness again declined, despite the U.S. Attorney's stating that he had no objection to such a conference. On the basis of Calhoun's clearly announced preference the trial court denied the defense motion. Appellants now assert that this action denied them due process of law, but again without citing authority for the proposition advanced. The reason seems probably to be that no decided cases support the position. The uniform holding is to the contrary, to the effect that a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so. See, e. g., United States v. Dryden, 5 Cir. 1970, 423 F.2d 1175; United States v. Mirenda, 9 Cir. 1971, 443 F.2d 1351.

## THE PHOTOGRAPHIC AND IN-COURT IDENTIFICATION

As related in the discussion of the factual background of this case, both of the victims were taken back to the Daleville jail on the night of the robbery where Benson, Wright, and Calhoun were being detained. Neither Lock nor Harrell could identify any of the three as their assailants during this brief encounter. However, upon being shown photographs of the same three persons on February 15, two weeks later, Lock was able to identify Benson and Thomas, and Harrell identified appellant Wright.

The only victim to testify at either of the November trials of Benson and Wright was Lock, who testified that Harrell was then in Vietnam.[5] We are concerned here, therefore, only with Lock's in-court identification of Benson, because Lock never identified Wright from a photograph or in person at either trial. During Benson's trial, the government sought to introduce evidence of Lock's photographic identification of Benson on February 15. The trial court sustained the defense's objection to this evidence. But the prosecution was then permitted to conduct an in-court identification by Lock of Benson despite defense objection. Benson asserts on appeal that the entire procedure of identification beginning with the February 1 confrontation and culminating with the in-court identification was "impermissibly suggestive" and led to a "substantial likelihood of irreparable misidentification" of him. Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247.

Benson urges that the confrontation of February 1 was the element of the

5. Wright's conviction was based on the testimony of Thomas and Calhoun, directly implicating him in both robberies, and his statement to Carroll. Lock testified to the events surrounding the holdup, identifying Benson, Calhoun and Thomas, but stated that he never got a good look at the other person in the rear seat of the Chevrolet.

overall identification procedure which made the photographic identification "impermissably suggestive." It is then submitted that the tainted photographic identification precludes any later in-court identification under our decision in United States v. Sutherland, 5 Cir. 1970, 428 F.2d 1152.

█ Appellant's position while appealing ignores the perspective from which the cited cases were decided. *Simmons* and its progeny have been confined to the *technique* of photographic display and identification, and do not deal with preceding circumstances which might affect the validity of such procedures. This is to say that the issue has been the physical presentation of photographic evidence to witnesses, and not what events led up to the visual examination. Similarly, our decision in *Sutherland* precluded in-court identification following photographic identification which "was impermissibly suggestive either in the photographs used or the manner or number of times they are displayed." *Sutherland*, supra, 428 F.2d at 1155. These cases are inapposite and do not aid appellant Benson. Additionally, the photographic display contained numerous pictures, not just those of appellants, and the records show that the two victims examined them independently, not jointly. We find nothing prejudicial to Benson in the presentation procedure followed by the government here.

The proper analytic framework for examining the issue under discussion here is found in Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. The Supreme Court there set out the minimum due process requirements the government must meet when it brings about a confrontation between witnesses and a suspect, at a time when the latter is not entitled to have counsel

present.[6] In *Stovall*, Stovall, suspected of murdering Mr. Behrendt and wounding his wife, was taken by police alone for possible identification to the hospital room where Mrs. Behrendt lay in critical condition following a knife attack and the major surgery undertaken to save her life. The petitioner Stovall urged that any confrontation "so unnecessarily suggestive and conducive to irreparable mistaken identification" would violate due process, but the Court held that such a finding must depend upon "the totality of the circumstances surrounding it." Stovall v. Denno, supra, 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206. It was crucial to the decision in *Stovall* that the only person capable of identifying or exonerating the suspect was the surviving victim whose critical condition made an immediate confrontation imperative. The fact that Stovall was not placed in a line-up under those compelling circumstances did not violate his right to due process.

Despite the lack of an apparent emergency in this case we do not consider that controlling as to appellant's due process claim. Appellant emphasizes that the victims here did not identify any of the assailants at the February 1 confrontation but were able to make some identifications from the photographic presentation two weeks later. This circumstance carries its own suggested explanation. Harrell and Lock had been robbed, roughed up, thrown from a bridge into a river, climbed to safety, then returned to Ft. Rucker for an immediate interview by Mr. Wells. They were not given medical examination and attention, dry clothing, or even an opportunity to compose themselves before being rushed back to the Daleville jail to examine the suspects. This confrontation was brief and cursory. The logical inference to be drawn by the

---

6. Appellants were manifestly not entitled to counsel at the February 1 confrontation, when they had been neither arrested nor indicted. In Kirby v. Illinois, 1972, 406 U.S. 682, 691, 92 S.Ct. 1877, 1883, 32 L.Ed.2d 411, 418–419, the Court noted expressly that "(w)hen a person has not been formally charged with a criminal offense, *Stovall* strikes the appropriate constitutional balance between the right of a suspect to be protected from prejudicial procedures and the interest of society in the prompt and purposeful investigation of an unsolved crime."

trial court and jury was that the two victims were suffering temporarily from physical and emotional strain sufficiently serious to prevent the exercise of their powers of observation and perception.

But appellant argues that this confrontation in fact led directly to the later February 15 photographic identification inasmuch as Lock's singling out of Benson from the photographic spread was only possible from his memory of Benson's face as he saw it on February 1. However, Lock testified positively and the jury was entitled to believe that he could remember nothing from the February 1 confrontation and that his in-court identification depended upon his being able to see Benson and hear him speak at the trial. Thus the choice we face here is between two plausible inferences: (a) that the in-court identification was made possible by Lock's brief encounter with the suspect in the Daleville jail, or (b) that it was instead the product of the time spent in the car during and after the robbery. Given the "totality of circumstances" peculiar to this case, we think it more likely that the witness, for purposes of identification, relied upon his hour-long exposure to Benson rather than upon the brief encounter at the Daleville jail at which several other people were present. This is especially so in view of Lock's physical and emotional condition at the time of the brief jail confrontation. We do not find that the later in-court identification was impermissibly tainted by the February 1 incident.[7]

## JURISDICTION

Appellants both challenge the government's proof of the jurisdictional facts requisite to conviction under Title 18 U.

S.C. Sec. 2111, which provides that "[w]hoever, within the special maritime and territorial jurisdiction of the United States, by force and violence, or by intimidation, takes from the person or presence of another anything of value, shall be imprisoned not more than fifteen years." Counsel for appellants moved for judgment of acquittal at the close of the government's case in each trial and assert here that the denial of that motion was error because of the government's failure to prove that Fort Rucker, Alabama is within the special territorial jurisdiction of the United States.

It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor. We held in Krull v. United States, 5 Cir. 1957, 240 F.2d 122, 127, a case involving a location (Chickamauga and Chattanooga National Parks, Georgia) allegedly under the exclusive jurisdiction of the United States, that one element of proof required of the prosecution is "to establish the situs where [the crime was] committed and show that such situs was within the jurisdiction of the United States." But the argument of the appellants fails to take into account the factor of judicial notice, which is a valid substitute for proof in connection with jurisdictional questions as well as other matters of evidence. "[T]he court will take judicial notice of [the] facts which vest the United States with jurisdiction . . .", Hudspeth v. United States, 5 Cir. 1955, 223 F.2d 848, citing Brown v. United States, 5 Cir. 1919, 257 F. 46.[8]

That both robberies took place within the territorial limits of Fort Rucker was testified to by Lock in each

7. We note also that the participation of Benson and Wright in the robbery of both Lock and Harrell was abundantly proved by the testimony of Herman Thomas and Joyce Louise Calhoun at both trials. Special agent Carroll's testimony as to Benson's oral statement at Panama City inculpated Benson in both robberies. Corroboration of that participation by Lock's testimony in Ben-

son's case would hardly rise to a prejudicial level even assuming *arguendo* that it was improperly received.

8. We have observed that "[t]he location and boundary of any incorporated city, as a subdivision of the state are judicially noticed, as well as locations of governmental buildings and institutions." Weaver v. United States, 5 Cir. 1962, 298 F.2d 496, 499.

trial. It was in order for the trial court to judicially notice the status of Fort Rucker as a military enclave under Title 18, U.S.C., Section 7(3), footnote 1 supra, "acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard or other needful building." The point raised is without substance.

### APPELLANT WRIGHT'S JURY

Finally we examine a claim of error raised only by Wright. It pertains to the events surrounding the selection of the jury which tried and convicted him. As previously noted Benson and Wright were tried separately and in that order. Prior to the commencement of Benson's trial, the court had tried the jury case of United States v. Innes Kelly. That jury was deliberating when Benson's trial began. When the Kelly jury reached a verdict, the court recessed the Benson trial in order to receive the verdict. After the jury verdict of Kelly's guilt was read aloud by the court clerk, the trial judge said to the jury, "That is, in my judgment, the proper verdict in this case. I don't see how you could have reached any other verdict under the evidence." At the conclusion of Benson's trial, and while the Benson jury was deliberating, Wright's trial jury was selected from a venire consisting in part of the jurors from the Kelly case and in part of talesmen who had been previously challenged by counsel in Benson's trial. Wright claims that the judge's comment praising the Kelly jury's verdict unfairly influenced those members of that jury who were also on his jury. The specific unfair influence claimed is that the jurors from the Kelly trial would feel a compulsion to return a verdict which would again meet the court's approval under the evidence.

The appellee's brief emphasizes the dubious procedural footing for this assertion of error. Wright's counsel failed alike to exercise any peremptory challenges, to request any correcting instructions, or to examine the jurors in question on voir dire as to the possible lingering effect of the judge's commendation. The function of voir dire examination of and challenges to prospective jurors is to raise alleged bias "from the realm of speculation to the realm of fact"; Dennis v. United States, 1950, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734, 736. Failure to conduct voir dire examination or at least request it, and to exercise challenges, peremptory and for cause, leave actual bias undetermined, and leave the trial court wide discretion to deal with questions of implied bias. See Dennis v. United States, supra, 339 U.S. at 167–168, 70 S.Ct. at 521, 94 L.Ed. at 736–737; Hill v. Dutton, 5 Cir. 1971, 440 F.2d 34; United States v. Haynes, 2 Cir. 1968, 398 F.2d 980; Jordan v. United States, 10 Cir. 1961, 295 F.2d 355. But regardless of any procedural infirmity present we think that Wright's claim of error in this respect is fatally defective on its merits. In United States v. Salazar, 5 Cir. 1973, 480 F.2d 144, the appellant alleged prejudice from a comment by the trial judge to the jury in the case preceding hers expressing doubt about the accuracy of their acquittal verdict. There, as here, appellant's jury was selected from a venire containing many of the same jurors. In *Salazar* we held that "[t]he mere fact that a judge informs a jury, after verdict, that he probably would have reached a different conclusion does not disqualify that jury for further service." Equally, and perhaps a *fortiori*, no disqualification for further service occurs when a trial judge, as here, expresses to a jury his approval of their verdict.

### CONCLUSION

No prejudicial error is demonstrated respecting either judgment of guilty appealed from. Those judgments are accordingly each

Affirmed.