## LA ROSA et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. October 19, 1926.)

No. 2490.

**1. Criminal law ⬅️762(2).**

Trial judge was entitled to express opinion on evidence, after instructing jury to draw their own conclusions, regardless of what court might think.

**2. Conspiracy ⬅️47.**

Evidence *held* insufficient to show that one of defendants had entered into conspiracy to sell, barter, transport, deliver, furnish, possess, and manufacture intoxicating liquor.

**3. Criminal law ⬅️762(2).**

In view of absence of evidence and circumstances showing conspiracy, expression of opinion by court as to his conviction that delivery of liquor was made pursuant to agreement *held* prejudicial.

In Error to the District Court of the United States for the Northern District of West Virginia, at Elkins; William E. Baker, Judge.

James La Rosa and another were convicted for conspiracy to sell, barter, deliver, transport, furnish, possess, and manufacture intoxicating liquor, and they bring error. Reversed.

Charles J. Schuck, of Wheeling, W. Va. (W. C. Grimes, J. Leonard Baer, and Schuck, Grimes & Baer, all of Wheeling, W. Va., on the brief), for plaintiffs in error.

Russell L. Furbee, Asst. U. S. Atty., of Parkersburg, W. Va. (Arthur Arnold, U. S. Atty., of Piedmont, W. Va., on the brief), for the United States.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

ROSE, Circuit Judge. In the court below the plaintiffs in error, together with Hyman Martin and Charles Belman, were indicted for a conspiracy to sell, barter, transport, deliver, furnish, possess, and manufacture intoxicating liquor. Martin and Belman forfeited their bail, and were not apprehended or tried. The plaintiffs in error, who will hereafter be called the defendants,

were convicted. Each of them was sentenced to Atlanta; La Rosa for 15 months, and Fazalare for a year and a day. The former was also fined $1,000.

About three in the morning of April 30, 1925, a motorcycle police officer of Clarksburg, W. Va., saw La Rosa driving his Cadillac car towards that place. The car was muddy, and gave some indication of having been recently towed. Close behind it was a Studebaker roadster, also muddy, and bearing Pennsylvania license tags. It looked as if one of its springs was broken or strained. There were two or three persons in it. The officer followed the two cars as closely as he thought expedient, but apparently for a time they got out of his sight. He, however, speedily found the Cadillac car, with no one in it, standing in the street near a garage of which La Rosa had the care or control. Believing that the Studebaker car was in that garage, he, by telephone, notified police headquarters, and shortly thereafterwards the chief of police and another officer arrived on the scene, armed with a warrant to search the garage. When they came to its door, they found it locked or bolted on the inside. They heard cans rattling within and men talking. They waited until one of those inside, who turned out to be Fazalare, opened the door in apparent ignorance of their presence. He was seized, and the policemen entered. Martin and Belman were seated in the Studebaker car, and had begun to back it out. It was not then pressing down on its springs. In the garage were found 90 gallons of moonshine liquor. They had not been in the garage at 5 o'clock the previous afternoon. This liquor was in cans.

The Studebaker roadster had a secret compartment with a capacity of 100 gallons or more, and there were strong indications that it had recently contained cans of liquor. In its pockets were found sets of license plates of New Jersey and of West Virginia.

La Rosa ran a hotel in Clarksburg, and Fazalare was his clerk, and lived in a house a few yards away from the garage in which the liquor was found.

Martin and Belman were strangers in Clarksburg, and there is no evidence that they had ever been there before. The defendants put no witnesses on the stand.

The above statement of the facts is a summary of the evidence offered on behalf of the government. The learned judge, in his charge to the jury, said that he was "fully convinced," "from the evidence and circumstances in the case," that Martin and Belman "were bringing that 90 gallons of liquor into Clarksburg for" La Rosa and Fazalare; "that, being strangers in the city, La Rosa and Fazalare met them at some point outside the city limits, and were piloting them with their load of liquor to the garage in question at the time" they were first observed by the motorcycle officer; "that the liquor had been delivered to La Rosa and Fazalare in the garage in question, and Martin and Belman were preparing to depart at the time the officers rushed in upon them." It may be noted that the record, so far as we can find, contained no evidence that Fazalare met Martin and Belman at any time before they reached the garage. No one identifies him as being with them, and the sole witness who testified as to the occupants of the car when it came into Clarksburg could not tell whether there were three, or only two persons in the Studebaker roadster, and his testimony is that La Rosa was alone in the Cadillac. Nor does there appear to be any evidence that the liquor was being brought to Fazalare other than the fact that he was in the garage at the time it was there unloaded.

[1] The judge was very explicit and emphatic in warning the jury that it was "their duty to draw" their "own conclusions from the evidence and circumstances of this case, regardless of what the court may think." He further told them that it was their "oath that has to be satisfied and which represents" their "own personal verdict." · He further said: "You are further charged that any personal opinion which you or any one or more of you may have as to the facts not proven cannot properly be considered as a basis for your verdict. You may believe as men that certain facts exist, but as jurors sworn to try this case, you can only act upon evidence introduced upon the trial, and from that evidence, and that evidence alone, you must form your verdict unaided, unassisted, uninfluenced by any opinion of the court or by any personal opinion you have, not founded or based upon testimony given in the case." In view of these clear instructions that the jury was to exercise its own judgment upon the facts, the learned judge was entitled to express his opinion as to the conclusion to which the evidence pointed, although it is to be regretted that he emphasized his own view by his statement that he was "fully convinced." He did not stop there. He told the jury: "I am further convinced *beyond any doubt* this delivery of liquor was made to La Rosa and Fazalare by Martin and Belman pursuant to an agreement or understanding." (The italics are ours.)

[2, 3] Of course, all the circumstances tend to show that Martin and Belman came to Clarksburg and to this garage as the result of some understanding with La Rosa, although so far as we can discover there was no evidence that Fazalare was necessarily a party to whatever arrangement had been made. There was evidence justifying the finding that Martin and Belman had illegally possessed and transported liquor, and that such transportation had been aided and abetted by La Rosa. The jury could also have found that the liquor, after its delivery to the garage was in the possession of La Rosa. We doubt very much whether the evidence would have justified a finding that Fazalare had possession of it. The government's testimony proved that he was an employé of La Rosa, and that he lived near La Rosa's garage, and that he was present when the liquor was there delivered. All this might be true without his being in any real sense in possession of the liquor. From the quantity and character of the intoxicants found, it might be assumed that La Rosa expected to sell the larger part of them, but there is no evidence whatever that he had made any agreement or arrangement with any of the other three that he should do so, or that, if he did, they should take any part in its disposal.

The maximum punishment which could have been inflicted upon La Rosa for aiding and abetting the illegal transportation of intoxicating liquor, or for being in possession of such liquor, was a fine of $500.

The vital point in the case was, Had La Rosa and Fazalare entered into a conspiracy to transport or possess liquor? We have already said that we find no evidence in the case that Fazalare had conspired with anybody to do anything. There is nothing to indicate that La Rosa had any understanding with Martin and Belman other than that he would buy the whisky from them, and that he would show them how to get to his garage. We shall not go into the nice inquiry as to whether such an understanding would or would not suffice to sustain a charge that he had entered into a conspiracy with them for the unlawful transportation of the liquor. If it does, seemingly any one who agrees to buy liquor from a bootlegger, and tells him how to get to his back door with it, commits an offense punishable by imprisonment in the penitentiary for as much as two years and by a fine of $10,000.

Be that as it may, the statement of the learned judge that he was "convinced beyond any doubt" that the delivery of the liquor "was made to La Rosa and Fazalare by Martin and Belman, pursuant to an agreement or understanding," must have been understood by the jury as an instruction that, as a matter of law, the evidence justified a finding that the defendants had conspired as charged, and as an emphatic, although not technically binding, expression of his personal opinion that upon the testimony no other conclusion was really open. It does not appear to us that there was any legally sufficient evidence that Fazalare had entered into any conspiracy whatever, and we cannot resist the conclusion that under all the circumstances La Rosa was also unduly prejudiced by the sweeping language which came from the bench.

Reversed.