**Eugene Kevin WELLS,
Plaintiff-Appellant,**

v.

**Edward MURRAY, Director, Virginia
Department of Corrections,
Defendant-Appellee.**

**No. 86–7683.**

United States Court of Appeals,
Fourth Circuit.

Argued March 2, 1987.
Decided Oct. 13, 1987.

Deborah C. Wyatt (Gordon & Wyatt, Jeffrey M. Gleason, Martin & Martin, Charlottesville, Va., on brief), for plaintiff-appellant.

Frank Snead Ferguson, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen. of Virginia, Richmond, Va., on brief), for defendant-appellee.

Before WINTER, Chief Judge, and MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge.

This is an appeal from the dismissal of Eugene Kevin Wells's federal habeas corpus petition. Wells shot and killed a teenager who had vandalized his car. At trial in Virginia state court, there was conflicting evidence as to whether this shooting was accidental or not. The jury convicted Wells of first degree murder and use of a firearm in the commission of a felony. After his appeal to the Virginia Supreme Court was dismissed, Wells petitioned for habeas corpus relief in federal district court. His petition was denied.

On appeal, Wells claims several procedural errors of a constitutional magnitude. He attacks the trial court's refusal to allow defense counsel to ask certain questions during voir dire, the trial court's exclusion of expert testimony concerning the propensity of his weapon for self-firing, and the propriety of jury instructions on self-defense. In our view, none of these alleged errors warrant reversal. Accordingly, we affirm the denial of Wells's habeas corpus petition.

## I.

At the time of the shooting incident, Wells lived in a remote area of Culpeper County, Virginia. On the weekend of September 3, 1983, a group of teenagers went camping near Wells's home. Wells discovered some of the teenagers vandalizing his car. One of the youths, eighteen year-old Joe Maybury, had smashed a rear window of the car. When Wells confronted the teenagers, they fled. Wells then returned to his home and considered the situation while drinking several beers.

Later that afternoon, Wells went to a lake where the teenagers were swimming. He took his shotgun with him. As he came upon the youths, Wells fired a warning shot into the air. He recocked his weapon and advanced upon the boys. There was conflicting testimony at trial as to the ensuing events. According to the prosecution's witnesses, Wells pointed the shotgun at Maybury and prodded him with it; Maybury was shot when he tried to push the shotgun away. Wells testified that Maybury attempted to grab the shotgun, that there was a struggle over possession of the weapon, and that the weapon accidentally discharged during the struggle. Maybury was shot in the abdomen. He subsequently died as a result of his gunshot wounds.

Wells was tried before a jury in the Circuit Court of Culpeper County in December, 1983. He was convicted of first degree murder and use of a firearm in the

commission of a felony. Wells was sentenced to life imprisonment for the murder charge and a term of two years for the firearms charge. He unsuccessfully appealed to the Virginia Supreme Court. He then petitioned for habeas corpus relief in federal district court, but his petition was denied. Wells now appeals the denial of his federal habeas corpus petition.

## II.

### A. *Voir Dire*

Wells first claims that he was denied a fair trial, in violation of the sixth amendment and the due process clause of the fourteenth amendment of the United States Constitution, because the trial judge failed to inquire adequately into juror prejudice on voir dire. Wells's claim arises from the publicity surrounding an earlier Culpeper County trial.

Less than a week before Wells's trial, several of the jurors who were in his jury pool sat on another criminal case involving embezzlement charges, *Commonwealth v. Richards*, (Criminal Court File No. 2516, Nov. 30, 1983). In *Richards*, the jury returned a verdict of not guilty. The presiding judge, who was not the judge in Wells's trial, criticized the jurors upon hearing their verdict. He stated that, by their verdict, the jurors were "telling the citizens and people of Culpeper County that it's all right for an employee to [embezzle]." He called their verdict a "gross miscarriage of justice." The judge asserted that he would have found the defendant guilty in about two minutes. He then discharged the jurors, admonishing them to return by December 6, 1983, the opening day of Wells's trial. The judge's criticism attracted the attention of a local newspaper, which printed a front-page story on the incident.[1]

■ At the start of Wells's trial, defense counsel proposed several voir dire questions based on the jurors' prior participation in the *Richards* case. Counsel wished to inquire whether the jurors were more inclined to convict Wells after being chastised for their leniency by the judge in *Richards*. The trial judge did not permit those questions to be asked. Instead, the judge asked more general questions, such as whether any of the prospective jurors had a personal interest in the outcome of Wells's case, and whether any of them had prior knowledge of Wells's case. When the prospective jurors indicated such prior knowledge, the judge questioned them individually, asking them what they had learned and how their knowledge would affect their views of the case. All of the veniremen questioned stated that their knowledge of the case would not influence their decision.[2]

■ Wells claims that these questions were insufficient, and that the trial court committed reversible error by failing to inquire into the effect of the public castigation which the *Richards* jurors experienced. His claim raises the much-litigated issue of pretrial publicity. It is firmly established that a defendant such as Wells is entitled to a fair trial, free from publicity that prejudices jurors against the defendant at its outset. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) ("the right to jury trial guarantees to the criminally accused a fair trial by

**1.** *See* Hoffman, "Judge Raps Jury for Setting Richards Free," *Culpeper Star Exponent*, Dec. 1, 1983, at 1–2, cols. 1–3.

**2.** Such affirmations are not universal guarantees of prospective jurors' impartiality. *See, e.g. Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975): "In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question." The veniremen's avowals of impartiality, however, are most suspect where the jury is comprised of individuals from a community deeply hostile to the accused. *See id.*

The situation described in *Murphy* is not present in this case. Wells does not claim that such a hostile atmosphere existed in Culpeper County. In Wells's case, we think that the trial judge's questions concerning prior knowledge of the shooting incident, and the veniremen's responses, are factors in determining the adequacy of voir dire. *See, e.g., United States v. Gullion*, 575 F.2d 26, 30–31 (1st Cir.1978) (when trial judge polled veniremen for bias resulting from pretrial publicity, conduct of voir dire did not give rise to a sixth amendment violation).

a panel of impartial, 'indifferent' jurors"); *see also United States v. Sawyers,* 423 F.2d 1335, 1344 (4th Cir.1970). Jurors, however, are presumed to be impartial, absent indications to the contrary. The existence of a juror's preconceived notion as to the guilt of the accused will not by itself destroy the presumption of impartiality. *See Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642–43. Only in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself. *See United States v. Haldeman,* 559 F.2d 31, 60, (D.C. Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).[3]

■ In other, less extreme situations, when external events such as pretrial publicity raise a strong possibility of jury bias,[4] the court has a duty to determine whether the accused may have a fair trial. Inquiry into jury bias typically entails an evaluation of "the pre-trial publicity complained of and its impact, if any, on the jury, as developed through adequate *voir dire* examination of the jurors...." *Wansley v. Slayton,* 487 F.2d 90, 92–93 (4th Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974).

■ It is the defendant's responsibility to demonstrate a strong possibility of jury bias. He must show, through adequate voir dire, that he was denied his right to a fair trial before a panel of unbiased jurors. *See Haldeman,* 559 F.2d at 60. The assertion that voir dire was inadequate, by itself, does not prove that the jury was not impartial. As noted in *Wansley,* " 'it is not sufficient to simply allege adverse publicity without a showing that the jurors were biased thereby.' " *Id.* at 92 n. 8 (quoting *Ignacio v. Guam,* 413 F.2d 513, 518 (9th Cir.1969), *cert. denied,* 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970)).[5]

■ In this case, Wells has not shown that he was, in all likelihood, denied his right to a fair trial. The publicity which Wells complains of—publicity surrounding the verdict in the *Richards* case—simply does not raise a strong possibility of jury bias. The trial court, then, acted within its discretion in refusing, during voir dire, to inquire into the effects of that publicity on the *Richards* jurors.

We reach this conclusion after much thought and consideration. A comparison of this case with leading decisions concerning the effects of pretrial publicity on the extent of voir dire is instructive. Wells urges us to analogize his case to the Supreme Court's decision in *Irvin.*[6] The

---

**3.** The *Haldeman* court ruled that the extensive news coverage surrounding the Watergate affair, standing alone, did not raise a presumption of prejudice to the defendants' constitutional rights. The court stressed that cases creating such a presumption were rare; the Supreme Court had found only one instance where this presumption applied. *See Rideau v. Louisiana* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). *Haldeman,* 559 F.2d at 60–61.

In *Rideau,* the defendant's confession to bank robbery, kidnapping, and murder was filmed and subsequently televised to tens of thousands of people in Calcasieu Parish, which had a total population of only 150,000. The court held that this publicity, which was tantamount to Rideau's confession to a large segment of the community, prejudiced his right to a fair trial.

Wells's case is clearly distinguishable from the *Rideau* situation. In contrast to Rideau, Wells strenuously argues his innocence, maintaining that Maybury's shooting was accidental. Moreover, as developed further in the text of this opinion, Wells does not even complain of publicity which involved him, but only of publicity involving several of the jurors.

**4.** This strong possibility of jury bias has been characterized as a "reasonable likelihood," *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), a "constitutionally significant likelihood," *Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1686, 90 L.Ed.2d 27 (1986), or a "significant possibility," *Jordan v. Lippman,* 763 F.2d 1265, 1267 (11th Cir.1985).

**5.** In *Ignacio,* defense counsel failed to question the veniremen about the effect of the alleged pretrial publicity, although the trial judge gave counsel ample opportunity to do so. Despite the trial judge's less compromising position in the present case, we think the principle articulated in *Ignacio* is applicable since Wells's claim of bias is quite attenuated.

**6.** Wells also asks us to draw a parallel between his case and the Supreme Court's decisions stressing the necessity of an adequate voir dire when racial prejudice is a factor. In his brief, Wells relies upon a number of decisions in which the Court considered a trial court's refusal to ask prospective jurors about their racial biases upon the request of a black defendant.

analogy is not an appropriate one. In *Irvin*, the defendant was indicted on murder charges in one Indiana county, where press releases stated that the defendant had confessed to the murder. The defendant was granted a change of venue to a nearby county that had also received the press releases. He was denied a second change of venue to a more remote county, and was subsequently convicted. The Supreme Court held that the defendant was denied his due process rights under the fourteenth amendment because his trial in state court was not impartial.

The situation in *Irvin* must be distinguished from the instant situation. In *Irvin*, the unfavorable publicity concerned the defendant himself, and it was disseminated throughout the community in which he was tried. By contrast, in this case, the publicity of which Wells complains did not concern Wells and the shooting incident. Instead, the media reported the castigation of several of Wells's veniremen by a different judge, in a different case, involving different issues. Wells asserts that this castigation made the *Richards* jurors reluctant to acquit a defendant in a later case. His assertion is too weak to warrant a reversal, especially in light of the *Irvin* Court's cautionary note:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved.... To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's im-

partiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722–23, 81 S.Ct. at 1642–43.

Like *Irvin*, later Supreme Court decisions have stressed that the kind of adverse publicity that warrants reversal of a criminal conviction is publicity that concerns the defendant himself. *See, e.g., Sheppard v. Maxwell*, 384 U.S. at 363, 86 S.Ct. at 1522 (reversal of murder conviction required when defendant's alleged crime was subject of heavy media coverage before and during the trial, and trial judge failed to shield defendant from publicity). Additionally, every case we have examined that discusses the trial court's duty, during voir dire, to inquire into the effects of pretrial publicity, focuses on publicity about the defendant. *See, e.g., Jordan v. Lippman*, 763 F.2d at 1265–67 (trial court's failure to conduct voir dire on inflammatory publicity in murder trial of black inmate violated defendant's constitutional rights); *United States v. Davis*, 583 F.2d 190, 196 (5th Cir.1978) (inadequate voir dire required reversal of defendant's conviction where defendant participated in widely-publicized jailbreak).

This distinction between publicity about the defendant and other types of publicity is strengthened by our decision in *Wansley v. Slayton*. In *Wansley*, we held that the denial of a defendant's motion for a change of venue based upon adverse pretrial pub-

---

*See Turner v. Murray*, 476 U.S. 1, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

In *Ham*, the Court held that the inquiry into racial prejudice was of "constitutional stature." *Ham*, 409 U.S. at 528, 93 S.Ct. at 851. Yet, subsequent decisions limited the scope of *Ham*. For instance, in *Ristaino*, the Court cautioned that "[b]y its terms Ham did not announce a requirement of universal applicability. Rather, it reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be [indifferent]...." *Ristaino*, 424 U.S. at 596, 96 S.Ct. at 1021.

More importantly, we think that the cases treating racial bias are not applicable to the present situation. Those cases are premised on the notion that racial bias may pose a constitutionally significant threat to the jurors' impartiality. Such a powerful threat is absent in Wells's case. Indeed, the *Ham* decision itself makes a distinction between inquiries into racial prejudice and other forms of prejudice. For example, the Court held that the trial court's refusal to question prospective jurors about their prejudices against bearded men, when the defendant was bearded, did not amount to a constitutional violation. *See Ham*, 409 U.S. at 528, 93 S.Ct. at 851.

licity was not a violation of due process. Significantly, we noted that:

> The most strongly pressed complaint of the petitioner on publicity ... deals with comments published from time to time, *not about the petitioner, but about one of his counsel....* It is doubtful, however, that any pre-trial reference in the press to an accused's attorney in the absence of any prejudicial or unfair comment on the accused himself or the merits of his offense, can justify a finding that the accused's right to a fair trial has been so prejudiced that due process is violated.

*Wansley,* 487 F.2d at 95 (emphasis in the original).[7]

■ The distinction we draw between unfavorable pretrial publicity about a defendant, which often warrants a voir dire inquiry, and publicity about other matters, which may not warrant such an inquiry, seems to us a reasonable one. The trial court's duty to inquire into the effects of any adverse publicity on jurors' views is not absolute; this duty is prompted only by a "constitutionally significant likelihood that, absent questioning[,] ... jurors would not be indifferent...." *Turner,* 106 S.Ct. at 1686. As *Irvin* and its progeny indicate, the likelihood of juror bias is strongest when the adverse publicity concerns the defendant himself and creates a hostile atmosphere in the community that permeates the jury box. The possibility of juror bias is much more remote when the publicity neither affects the defendant, nor gives the jury any concrete reason to doubt the defendant's innocence. This was the case in *Wansley,* in which the publicity of which the defendant complained involved defense counsel, rather than the defendant. It is also the case here, because the publicity at issue concerned the jurors' participation in an earlier trial, rather than the defendant.

■ Our conclusion is also supported by decisions discussing the effect that a trial judge's remarks about a jury's verdict have on the jurors. Generally, reviewing courts have not treated such remarks harshly; a trial judge's comments do not warrant reversal unless they are so prejudicial as to constitute the denial of a fair trial. *See United States v. Preston,* 608 F.2d 626, 636 (5th Cir.1979). Courts have applied this principle to a judge's remarks about a verdict, as well as a judge's comments during trial. *See United States v. Benson,* 495 F.2d 475 (5th Cir.), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 310 (1974); *United States v. Salazar,* 480 F.2d 144 (5th Cir.1973); *Chavez-Martinez v. United States,* 407 F.2d 535 (9th Cir.), *cert. denied,* 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969).

*Salazar* is especially instructive, since it involves a factual situation similar to our own. In *Salazar,* the defendant was prosecuted for possession of marijuana with the intent to distribute. His venire included twelve individuals who had sat on a similar criminal case involving a different defendant. In that earlier case, the jury had acquitted the defendant. The trial judge, like the *Richards* judge, had expressed his disagreement with the jury's decision. Significantly, the *Salazar* court found that the judge's public disapproval of the verdict in the earlier case was not dispositive: "The mere fact that a judge informs a jury, after the verdict, that he probably would have reached a different conclusion does not disqualify that jury for further service." *Salazar,* 480 F.2d at 145.

The *Benson* court relied on this language in finding no prejudice to the defendant, although his venire included several jurors who had been praised by the same judge for returning a guilty verdict in an earlier case. *See Benson,* 495 F.2d at 482. The

---

7. Our decisions in a related field also support the distinction between publicity unfavorable to a defendant and other types of publicity. *See Donovan v. Davis,* 558 F.2d 201 (4th Cir.1977); *Wall v. Superintendent, Virginia State Penitentiary,* 553 F.2d 359 (4th Cir.1977). In both of these cases, we found that the defendant was denied his right to a fair trial because several of

the jurors had previously sat on a jury which had received unfavorable information about the defendant. We stressed that it was the receipt of information about the defendant himself which potentially prejudiced the jurors and denied the defendant the right to a fair trial. *See Donovan,* 558 F.2d at 204.

government had argued that defense counsel had made several procedural mistakes, such as failing to exercise any peremptory challenges, which should have precluded defendant's claim of prejudice. The court stressed that, regardless of whether or not these alleged mistakes occurred, the defendant was not denied his right to an impartial jury. The court relied upon *Salazar's* ruling that the judge's comments disapproving the jury's verdict did not bar jurors from further service; it extended that ruling to the judge's comments approving the jury's verdict. *Benson* suggests that the principle articulated in *Salazar* may be applied to a number of situations in which the trial court comments upon the jury's verdict, including the situation presented in Wells's case.

*Chavez-Martinez*, which was decided prior to *Salazar* and *Benson*, also found no prejudice resulting from a judge's post-verdict comments. In that case, the defendant was convicted of drug smuggling charges. The defendant claimed that the trial judge erred in not asking potential jurors, on voir dire, whether they would be influenced by the judge's criticism of a jury's verdict in another case. The court of appeals held that the defendant was not prejudiced by the trial judge's omission. The court found that the trial judge's questions to the jury had eliminated any possible prejudice to the defendant.

The few decisions which adopt a more restrictive tone, *see, e.g., United States v. Bland*, 697 F.2d 262 (8th Cir.1983); *Everitt v. United States*, 281 F.2d 429 (5th Cir. 1960), and indicate that the trial judge's post-verdict comments may hamper jurors from serving on further juries, are distinguishable from Wells's case. In *Bland*, the defendant was convicted in federal district court for violations of gun control laws. After the jury returned its verdict, the trial judge remarked that criminal cases tried in federal court are generally more thoroughly investigated than those tried in state court. The judge also observed that successful defenses are less frequent in federal court than in state court and that most federal defendants are guilty of the crimes with which they are charged. The court of appeals held that the trial judge's post-verdict remarks were not prejudicial to the defendant. Yet, the court also observed that the judge's remarks would be prejudicial to other criminal defendants tried in federal court, because several of the jurors were likely to sit on additional federal criminal cases. *See Bland*, 697 F.2d at 266.

The general nature of the trial court's statement in *Bland* distinguishes that case from the present situation. The observations made by the *Bland* judge about the differences between federal and state trials, and the culpability of most federal criminal defendants, had broad applicability. These statements could have influenced the jurors' decisions in future criminal cases they might sit on. It was the broad nature of the trial judge's statements which the *Bland* court focused upon in indicating that those statements were prejudicial. By contrast, in the present case, the statements by the *Richards* judge of which Wells complains were narrowly tailored to fit the case at hand. The trial judge in *Richards* simply criticized the jurors for acquitting the defendant of embezzlement charges. His remarks, unlike the remarks of the trial judge in *Bland*, may not have influenced the jurors in future cases. We cannot say that the statements of the judge in *Richards* prejudiced the jurors, who considered a wholly different set of facts and charges in Wells's case.

Like *Bland*, *Everitt* is distinguishable from Wells's case. The *Everitt* court examined the impact on the defendant, Glenn, of an earlier trial involving his codefendant, Everitt. The court held that it was reversible error to allow several jurors to sit on Glenn's jury after they had returned a guilty verdict in Everitt's case and had been praised by the trial judge for their speedy decision.

Clearly, the two cases on which the jurors sat were more closely related in *Everitt* than in the present situation. In *Everitt*, the two cases involved codefendants; the jurors were likely to have received unfavorable information about Glenn when they sat on Everitt's jury. The trial judge

was the same in the two cases; the jurors might have felt compelled to present the judge with another guilty verdict after he had praised them for their decision in Everitt's case. Neither of these considerations applies in the present situation. Wells's case was unconnected to the *Richards* case, and the trial judge in Wells's case was not the same judge who presided over the *Richards* trial.

 We conclude that the trial judge did not commit reversible error in failing to question the prospective jurors about the impact which the *Richards* case had on them. We hasten to add, however, that we do not condone the behavior of the trial judge in Wells's case. The better practice would have been for the trial judge to prevent the *Richards* jurors from sitting in Wells's trial. The judge could have easily discovered which of the veniremen sat on the *Richards* jury, and removed them from the jury selection process. In this manner, the judge would have forestalled the complaint that Wells now makes. Yet, because Wells's complaint raises no substantial likelihood of prejudice, the trial judge's actions do not warrant a reversal.

### B. *Refusal to Admit Evidence that the Gun Fired Accidentally*

Wells's primary theory of defense at trial was that the gun which killed Maybury discharged accidentally during the struggle between Wells and Maybury. A state expert examined the gun and determined that it could be made to fire without pulling the trigger. Wells sought to introduce evidence to that effect at trial, and the judge held an evidentiary hearing after excusing the jury. In the course of the evidentiary hearing, the expert testified that he had caused the gun to fire by hitting it with a mallet.[8] The expert also testified that the gun could have fired accidentally during a struggle, but only if it was struck against a solid object. The court refused to admit the expert testimony that the gun would discharge if hit with a mallet or struck with

a solid object, basing its ruling on the fact that there was no evidence that the gun had received such a blow during the struggle.

 Evaluation of the admissibility of evidence is normally the province of the trial judge. *See Moore v. Illinois*, 408 U.S. 786, 799, 92 S.Ct. 2562, 2570, 33 L.Ed.2d 706 (1972); *Savage v. Nute*, 180 Va. 394, 23 S.E.2d 133, 137 (1942). However, exclusion of evidence so significant that the defendant is denied due process constitutes reversible error. *See, e.g., United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (prosecution's failure to disclose exculpatory evidence); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (right to confront witnesses). At a minimum, for the exclusion of evidence to constitute a denial of due process, the defendant must show that the excluded evidence would have been material to his defense. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982).

 Wells makes no such showing. He asserted during oral argument that the failure to allow the introduction of the expert testimony adversely affected the jury's perception of his credibility, since he testified that the gun had discharged accidentally. That argument is not persuasive. Wells would not have appeared any more credible in light of evidence that the gun could, in theory, discharge accidentally. The testimony which he sought to introduce would have shown that the gun could discharge accidentally only in circumstances other than those which he testified existed, i.e., upon a blow from a solid object.

### C. *Jury Instructions*

Wells claims that the trial judge erred in instructing the jury on self-defense. Wells requested a jury instruction on pure self-

---

8. The expert also stated that he had performed a "push-pull" test, reenacting with defense counsel the kind of struggle Wells testified had taken place. The gun did not discharge during the push-pull test. In the course of the hearing the expert unsuccessfully attempted to make the gun fire by hitting it painfully hard with his hand.

defense, which the judge declined to give.[9] Instead, the judge gave an instruction pertaining to self-defense after withdrawal from aggression. On appeal, Wells attacks both the trial judge's failure to give his instruction and the propriety of the instruction that the judge did give.

 Wells' contention that the trial judge should have instructed the jury on pure self-defense can be quickly answered. A defendant is only entitled to a charge for which there is a foundation in the evidence. *See United States v. Parker*, 742 F.2d 127, 129 (4th Cir.), *cert. denied*, 469 U.S. 1076, 105 S.Ct. 575, 83 L.Ed.2d 514 (1984); 2 C. Wright, *Federal Practice & Procedure* § 485, at 710 (1982). It was simply not open to Wells to claim pure self-defense when he had initiated the altercation by approaching the unarmed victim and pointing a loaded shotgun at him.

 Wells's second claim is that the self-defense instruction which was tendered—as to withdrawal after aggression—was misleading and confusing. We reject Wells's claim that the charge might have led the jury to conclude that self-defense was not a defense available to him. The withdrawal instruction read as follows:

> The court further instructs the jury that where the plea of self defense is relied upon in a trial for murder, the law is that a plea of self defense is not available to the party unless he was without fault in bringing about the difficulty. If you believe that the defendant was with some fault in provoking or bringing on the scuffle, and if you further believe that when attacked he retreated as far as he could safely, as he safely could under the circumstances in a good faith attempt to abandon the fight and made known his desire for peace by word or act and that he reasonably feared under the circumstances as they appeared to him that he was in danger of being killed or was, or he was in danger of great bodily harm,

then the killing was in self defense and you shall find the defendant not guilty.

In reviewing this jury instruction, we must read the instruction as a whole. *See Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Gore v. Leeke*, 605 F.2d 741, 742–43 (4th Cir.1979), *cert. denied*, 444 U.S. 1087, 100 S.Ct. 1048, 62 L.Ed.2d 774 (1980). Surely, the jury would not have thought that the first sentence of the charge ("a plea of self defense is not available to the party unless he was without fault in bringing about the difficulty") mooted the effect of the following sentences which addressed self-defense after aggression and withdrawal.

 Apart from the merits of the claim that the instruction was confusing, the government argues that Wells cannot now raise the issue, because he failed to enter a contemporaneous objection at trial. A federal habeas petitioner who has failed to comply with the contemporaneous objection rule at trial must show cause for the procedural default and some resulting prejudice in order to obtain review of his constitutional claim. *See Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2678, 91 L.Ed.2d 397 (1986) (Brennan, J., dissenting) (citing *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). Wells can show neither cause nor prejudice. Thus, his claim of prejudice from the misleading jury instruction must fail for the additional reason of procedural default.

\* \* \* \* \* \*

In conclusion, we uphold the decision of the district court denying Wells's habeas corpus petition. We find no merit in Wells's attacks on the exclusion of expert testimony and the jury instruction on self defense. The voir dire issue is more difficult to resolve. We are, however, unwilling to upset the trial court's refusal to question the jurors about the *Richards* case, when Wells has not shown that the

---

**9.** The instruction that Wells requested read:
 If you believe that the defendant was without fault in provoking or bringing on the scuffle and if you further believe that the defendant reasonably feared, under the circumstances as

they appeared to him, and he was in danger of being killed or that he was in danger of great bodily harm, then the killing was in self-defense and you shall find the defendant not guilty.

court's action created a substantial likelihood of prejudice.

The judgment of the district court denying the petition for habeas corpus is

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

I respectfully dissent from that part of the majority opinion which holds that the defendant's right to trial by a fair and unbiased jury was assuredly not interfered with by events that occurred before the trial began.

The majority's position is problematical in a number of respects. First, the majority fabricates a test of its own design—requiring a "strong possibility" of prejudice—for evaluating claims of jury bias in the absence of *voir dire*. Such a test has no basis in the case law, and cannot be reconciled with the test adopted by this Circuit which requires that a "reasonable likelihood" of prejudice be shown. *Wansley v. Slayton*, 487 F.2d 90, 92 (4th Cir. 1973), *cert. denied*, 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974).

Second, the case law from which the majority attempts to gain support for its conclusion is inapposite. The majority uniformly relies upon cases in which the defendant was permitted fully to question the jurors on *voir dire* and to develop a complete record from which the court could properly evaluate the existence or nonexistence of prejudice. The standard for proof of prejudice when a complete record is available will of course be stricter than the standard which applies where the defendant has been completely denied the opportunity to inquire into and establish prejudice. Here *voir dire* on the possibly prejudicial matter was summarily denied. Wells was denied any opportunity to prove prejudice on the part of the jurors earlier

chastised by the trial judge for acquitting a defendant in another criminal trial.

A third difficulty with the majority opinion is that although the case law requires a court to consider the "totality of facts," *Wansley v. Slayton*, 487 F.2d at 92, in evaluating claims of jury prejudice, the majority seeks to characterize the present case as involving pretrial publicity only. Such a characterization blatantly ignores the "totality of facts" creating prejudice in the present circumstance, since the primary source of prejudice was the judge's harsh criticism of jurors and the way their action might be influenced and not the publication of a newspaper article.

Finally, the majority attempts to create a distinction between the present case and other cases based on the fact that the prejudicial commentary did not focus specifically on the defendant. The distinction falls flat as a matter of common sense since what is at issue is not whether a comment was directed at a specific person, but whether the defendant was tried by an unbiased jury undeterred from applying the presumption of innocence, whatever the reason. The majority inadvertently acknowledges its error when it attempts to distinguish *United States v. Bland*, 697 F.2d 262 (8th Cir.1983) on exactly the opposite basis, namely that the judge's commentary in that case was more *general* than the commentary at issue here.

Despite what amounts to an attempt by the majority to obscure the applicable standard, the rule is that where events have occurred outside the trial which, "by reason of [their] impact on the jury, raise the *'reasonable likelihood'* or probability that the accused has been prejudiced in his right to a fair trial, the trial court is obligated to take appropriate steps to determine whether in fact the accused can secure ... a fair trial." *Wansley v. Slayton*, 487 F.2d 90, 92 (4th Cir.1973), *cert. denied*, 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974) (emphasis added).[1]

1. *See Turner v. Murray*, 476 U.S. 1, ——, 106 S.Ct. 1683, 1694, 90 L.Ed.2d 27 (1986) (a duty to inquire is triggered by a "constitutionally significant likelihood that, absent questioning[,] ... jurors would not be indifferent ..."); *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966) ("reasonable likelihood"); *Jordan v. Lippman*, 763 F.2d 1265, 1266–67 (11th Cir.1985) ("significant possibility"); *United States v. Sawyers*, 423 F.2d 1335, 1344 (4th Cir.1970) (in presence of prejudicial

The determination as to whether there is a "reasonable likelihood or probability" of prejudice requires an evaluation of the "totality of the surrounding facts in the matter." *Wansley v. Slayton*, 487 F.2d at 92. The totality of facts in the present case without doubt demonstrate a reasonable likelihood of prejudice.

I will briefly list and then elaborate upon the totality of the facts suggesting prejudice in the present case. First, the harshness of the judge's criticism is significant. Second, it is relevant that the critique came from a judge, a person who generally commands the respect of jurors as knowledgeable in legal matters, whether or not the critique was publicly reported. The publicity here only further enhanced an already disturbing situation. Third, the sensitivity of the determination which the jury was called on to make, assessing the *mens rea* of a defendant charged with first degree murder where the evidence as to intent was in conflict and setting a sentence of from one year to life imprisonment, made the situation ripe for bias to have an effect. Fourth, the trial concerned the shooting death of an eighteen-year-old honor student which made the case one of public concern. Jurors who had once been chastised would suspect that they might again be subject to public reprimand—or even reprimand by the relative few who, by reason of their job duties, or who from curiosity or interest, frequent the court while it is in session and spread the word even further via the grapevine—if they found the defendant not guilty or guilty of a lesser offense. Fifth,

the recency of the criticism (six days) and the number of jurors who were exposed to it must not be overlooked.

At least five jurors who served on petitioner's jury had been sharply criticized by another judge for returning a verdict of innocent in the last criminal case in which they had participated, the week before petitioner's trial began. The judge in the first case stated:

I can tell you that in this case I would have found this defendant guilty and it would have taken about two minutes to do so. I appreciate the time that you all have taken ... in there, four hours and obviously there was area of disagreement. But I want to tell you what the effect of your verdict is. By this verdict you are telling the citizens and people of Culpeper County that it's all right for an employee to take large sums of money from an employer without permission and convert it to his or her use so long as the employee leaves a note promising to pay for it over a long period of time.... This is the effect of your verdict. I think it's a gross miscarriage of justice and I don't think you have done the citizens of Culpeper County any favor.

The incident was the subject of comments from a presumably unbiased source in a newspaper article entitled "Innocent: Judge Raps Jury for Setting Richards Free." Petitioner brought the incident to the trial judge's attention and proposed several *voir dire*[2] questions to no avail.[3]

The identity of the commentator must be considered in the evaluation of prejudice.

pretrial publicity, there is a duty to inquire regarding impact on veniremen).

**2.** The threatened prejudice was not dissipated by the trial judge's general questioning of jurors as to whether they could render an impartial decision. At least in cases such as that here, where the potential for prejudice is very high, general questioning of the jurors will not suffice to unearth the sources of prejudice which can effect a verdict. In such circumstances the juror is poorly placed to make a determination as to his own impartiality. *See Jordan v. Lippman*, 763 F.2d 1265, 1281 n. 18 (11th Cir.1985); *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978). *See also Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975) (where community has been permeated with

prejudicial publicity, the reliability of jurors' protestations of impartiality may be drawn into question); *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial.... [S]uch a statement ... can be given little weight.").

**3.** Petitioner had no means to prevent these jurors all from serving because, under Virginia law, he was only permitted four peremptory challenges, Va.Code § 19.2–262 (1983), and there were five suspect jurors. Had petitioner exercised any of the four peremptory challenges to exclude a previously seated juror, he would have had to have foregone a peremptory challenge of some other potential juror he looked on with disfavor.

The fact that the judge presides in an arena as powerful, austere and formal as the judicial courtroom magnifies the significance of his statements in the mind of the lay juror. In *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), in deciding that a trial judge's remarks during trial unduly prejudiced the jury, the Supreme Court articulated this point: "The influence of the trial judge on the jury is 'necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling.'" *Quercia*, 289 U.S. at 470, 53 S.Ct. at 699; *Anderson v. Warden*, 696 F.2d 296, 301 (4th Cir.1982) (*en banc*), *cert. denied*, 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983).

With the judge's reprimand still fresh in mind and without the benefit of *voir dire*, the jurors were led into the jury box where they were bound by their oaths to administer justice in the well publicized trial [4] of a "long-haired, bearded" misfit who had caused the death of an eighteen-year-old honor student. Because the case involved the killing of a human being and the Commonwealth charged first degree murder, the jurors were responsible not only for deciding whether the accused was guilty or innocent, but for making sensitive determinations as to the degree of petitioner's culpability. They were instructed to determine what petitioner's mental state was when he caused the death so as to render an appropriate verdict of guilty—of first degree murder, second degree murder, voluntary manslaughter or involuntary manslaughter—or not guilty.[5] In addition, by law, the jurors set petitioner's sentence. Va.Code § 19.2–295 (1983).[6] There can be little doubt that there was a not-negligible possibility for another judge's criticism of only days before to have a substantial effect upon the verdict and a choice of sentences ranging from life imprisonment to one year.

Despite the facts suggesting prejudice and the absence of *voir dire* the majority concludes that Wells has not shown a "strong possibility" of jury bias and that, absent a showing of a "strong possibility" of prejudice, there is no error which warrants reversal. The majority takes some uncertain and fallacious steps to reach its conclusions. First, it is impossible to ascertain the basis for the majority's "strong possibility" standard, since it is not the standard explicitly adopted in *Wansley v. Slayton, supra*, a Fourth Circuit opinion which states that defendant must demonstrate a "reasonable likelihood" of prejudice before becoming entitled to *voir dire*. Nor is such a "strong possibility" standard announced in any other case of which I am aware.

---

**4.** Almost all of the jurors indicated on *voir dire* that they had heard or read about the case in local or national newspapers.

**5.** The jury was instructed as to first degree murder, second degree murder, voluntary manslaughter, involuntary manslaughter and the sentences which it could set for each crime. The judge instructed the jury that it should find the defendant guilty of first degree murder if it found proof beyond a reasonable doubt that:

> The defendant killed Joseph Maybury, that the killing was *malicious* and that the killing was *wilful, deliberate* and *premeditated.*

The jury was instructed to find petitioner guilty of second degree murder if the killing was malicious, but "you do not find ... that the killing was wilful, deliberate and premeditated." The jury was told that voluntary manslaughter was the appropriate verdict if

> [T]he killing was a result of an intentional act and the killing was committed while in the sudden heat of passion upon reasonable provocation or in mutual combat.

Finally, involuntary manslaughter was defined as "the killing, although unintended, was the direct result of criminal negligence."

The facts would have permitted the jury to find petitioner innocent or to find that the defendant had any of the mental states associated with criminally causing the death of another human being. The testimony, though in conflict at points, could have been understood to portray accident, the heat of passion, a struggle, the consumption of substantial quantities of alcohol—which may have affected petitioner's mental state—as well as premeditated killing. After the student was shot, petitioner helped transport him to the hospital. Petitioner voluntarily gave a statement to the police, explaining that "[t]hat kid was never supposed to get hit. Frightened, yes, paid back, yes, but never shot."

**6.** The jury was charged to sentence the defendant to terms ranging from life for first degree murder to one year for involuntary manslaughter.

Second, the precedents which the majority cites in support of its stricter proof requirement are inapposite. In the cases on which the majority relies *voir dire* was permitted in every case to determine whether jurors had or had not been influenced by exposure to prejudicial pretrial events.[7] Wells was flatly rebuffed in his attempts to conduct *voir dire.*

The principles which the majority extracts from cases in which *voir dire* was permitted cannot properly be applied in the present case where *voir dire* was denied.[8] In the present case defendant was not permitted to question jurors and, consequently, need only show that there was a "reasonable likelihood or probability" that the jury was affected by the prejudicial events. *Sheppard v. Maxwell,* 384 U.S. at 363, 86 S.Ct. at 1522; *Wansley v. Slayton,* 487 F.2d at 92. The reasons for the rule are obvious: A thorough *voir dire* which unearths no bias creates a strong presumption that bias is absent. It is in such a context that the cases cited by the majority have established a strict standard for substantiating allegations of jury bias. On the other hand, once a reasonable likelihood of prejudice is shown, if *voir dire* is not permitted, there is nothing to rebut the presumption of prejudice established by the

defendant's showing. More importantly, where the defendant's hands are tied by the denial of the opportunity to inquire into bias or prejudice, he can not fairly be required to establish the existence of prejudice to the same degree of certainty as a defendant who was given the opportunity to probe the jurors' consciences.

It is easy to perceive the unfairness of requiring the defendant to prove prejudice to the same degree of certainty whether or not he was permitted to *voir dire* the jury. Indeed portions of the majority opinion illustrate the Catch–22 the holding will create. The majority writes:

> It is the defendant's responsibility to demonstrate a strong possibility of jury bias. He must show, *through adequate voir dire,* that he was denied his right to a fair trial before a panel of unbiased jurors.

Slip op. at 472 (emphasis added). However, a defendant can hardly be expected to prove that he was prejudiced through the use of adequate *voir dire* when he has been denied all right to conduct *voir dire.*

The majority opinion rests on equally shaky ground when it ignores the admonition of the case law that prejudice must be evaluated by examining the totality of the circumstances and attempts to treat the

---

**7.** *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (publicity surrounding trial and circus atmosphere of court room prejudiced jurors despite *voir dire* ); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (television broadcast of confession viewed by three jurors required reversal regardless of what jurors stated in *voir dire* ); *Irvin v. Dowd,* 366 U.S. 717, 720, 81 S.Ct. 1639, 1641, 6 L.Ed.2d 751 (1961) (*voir dire* examination lasted four weeks, however, despite jurors' statements that they could disregard any predisposition based on pretrial publicity, conviction was overturned); *Wall v. Superintendent,* 553 F.2d 359 (4th Cir.1977) (jurors quizzed on *voir dire* stated without reservation that they would be fair, yet the Fourth Circuit reversed the conviction and remanded for a new trial); *United States v. Haldeman,* 559 F.2d 31, 65 (D.C.Cir. 1976) (extensive *voir dire* was conducted which corrected any prejudice that might have been suspected as the result of pretrial publicity), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Wansley v. Slayton,* 487 F.2d 90 (4th Cir.1973) (defendant is entitled to *voir dire* where a reasonable likelihood of preju-

dice is shown, however, where examination of the veniremen was extensive and none of the jurors empanelled indicated prejudice, the verdict could stand), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974); *Ignacio v. Guam,* 413 F.2d 513, 516–18 (9th Cir.1969) (attorneys for the defendants were given an opportunity freely to question jurors as to prejudice during *voir dire,* but declined to do so. Because the defendants had failed to show that adverse publicity had biased the jurors *after being given the opportunity to do so,* the court rejected the claim of error.), *cert. denied,* 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970).

**8.** For example, in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), cited by the majority, extensive *voir dire* was undertaken. The Supreme Court stated that the test for jury bias on such a complete record is "whether the nature and strength of the opinions formed [by the jurors] are such as in law necessarily * * * raise the presumption of partiality." 366 U.S. at 723, 81 S.Ct. at 1643. It is impossible even to apply the Supreme Court's test if the defendant is not permitted to question the jury.

present case as if the only claimed source of prejudice was the pretrial publication of a newspaper article detailing the criticism by the judge of the jury in another case. Such an argument is a straw man. Clearly, in and of itself the publication of the newspaper article with respect to another case was not so prejudicial as to require reversal. The publication is, however, only a factor in assessing prejudice since it may have compounded a predisposition by making the jurors aware that they performed their duties under public scrutiny and should give heed to an exhortation in another case to be tough on the defendant in Wells' case. It should not be forgotten that the primary source of prejudice in the present case is the fact that five jurors who had been criticized for returning a verdict of not guilty were seated on petitioner's jury.[9] The criticism combines with other factors in Wells' case to create a totality of circumstances supporting defendant's claim of prejudice. By characterizing the case as involving pretrial publicity and ignoring the other facts, the majority simply does not fairly address the case before it.

There is little more substance to the majority's attempt to suggest a distinction based on whether the prejudicial events dealt specifically with the defendant. As even the majority concedes in its discussion of *United States v. Bland,* 697 F.2d 262 (8th Cir.1983), such a general principle is not absolute [10] and does not override the rule of our cases that the existence a reasonable likelihood of prejudice must be assessed after examination of all of the circumstances. The majority's attempt to distinguish *Bland* reveals the majority's error. In *Bland* the Eighth Circuit stated that certain remarks made by a trial judge would be "clearly prejudicial" to future defendants. The majority attempts to distinguish *Bland* on the ground that the remarks in that case were more *general* than the remarks made in the present case:

> The observations made by the *Bland* judge about the differences between federal and state trials, and the culpability of most federal criminal defendants, had

9. Cases dealing with jury bias are not limited to pretrial publicity. In the area of racial prejudice, the Supreme Court has held that the mere fact that a crime was interracial does not raise the specter of bias or prejudice. *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). However, the Court has reversed convictions in interracial crimes where *voir dire* as to racial bias was refused and race was "inextricably bound up with the conduct of the trial." *Ristaino v. Ross,* 424 U.S. at 597, 96 S.Ct. at 1021. *See Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). The potential that racial bias will affect a juror's judgment is greater where the jury is called upon to make the "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves'" in a death penalty case. *Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27 (1986).

Prior knowledge of a case is another cause which can defeat the presumption of juror impartiality although a juror is not required to be totally ignorant of the facts and issues pertinent to a case. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Prejudice has been presumed and convictions reversed although *voir dire* was conducted and jurors denied that their judgment would be affected by extensive pretrial publicity to which they had been exposed. *Irvin, supra;* 28 A.L.R. Fed. 26 (1976).

Jurors have been held irrevocably tainted because of their participation in proceedings which concerned the defendant prior to sitting on a jury which convicted the defendant, despite statements on *voir dire* that they would be able to disregard the earlier information. *Donovan v. Davis,* 558 F.2d 201 (4th Cir.1977); *Wall v. Superintendent,* 553 F.2d 359 (4th Cir.1977).

Juries have also been held to have been prejudiced by events which occurred after they had been empanelled. Particularly relevant to the present case are cases where it was held that a jury was prejudiced by a trial judge's expression of his belief that the defendant was guilty. *La Rosa v. United States,* 15 F.2d 479 (4th Cir.1926); 7 A.L.R.Fed. 377 (1971). For additional examples of the type of circumstances which have been considered for prejudice see 28 A.L.R.Fed. 26 (1976); 9 Fed.Proc.L.Ed. § 22–788–793 (1982).

In any case it is not that Wells contends that he inevitably was tried by a jury shown of its impartiality. Wells objects that he was not allowed even to explore the real *possibility* of juror prejudice.

10. For example, where race is the source of jury bias, the prejudice is not directed at an individual, but at a class of persons of which the individual is member. It is a generalized bias which has an effect upon a specific individual. So might a general statement by a trial judge about the error involved in holding a criminal defendant not guilty bias a jury toward a particular criminal defendant.

broad applicability. These statements could have influenced the jurors' decisions in future criminal cases they might sit on. Slip op. at 475. Certainly the majority cannot argue that the remarks at issue in the present case were not prejudicial because they were not specific and at the same time claim that the remarks were not sufficiently general to create prejudice. Such inconsistent reasoning reveals the fragility of the suggested distinction.

The *Bland* case illustrates the reality that a trial judge's remarks to a jury may be prejudicial despite the fact that they do not concern a particular defendant. Just as in *Bland*, the jury in the present case may have interpreted the trial judge's remarks as reaching broadly beyond their context. Although the trial judge's statement did not address Wells directly, it may have worked subtly to undermine the confidence that the jurors had in their own judgment, so that they were compromised in their ability independently to consider the evidence and fully to participate in the deliberations. The remarks may have served to link, in the jurors' minds, the judge and the prosecutor. Alternatively, some jurors may have felt, as the result of the criticism and the publicity surrounding the trial, that they would be subject to disapproval in the minds of others if they rendered a verdict of guilty of a lesser offense or of not guilty. More ominously, the comments could have been understood as a general exhortation to find guilt, resulting, in the minds of some jurors, in a lessening of the principle that the jury's function is to judge the evidence according to the dictates of its conscience, resolving reasonable doubt in favor of the defendant. Although these effects are different from the effects of an article concerning a particular defendant, it is impossible to say categorically that they are not as gravely prejudicial, particularly in the absence of any inquiry as to the effects of the comments upon the jurors. A likelihood is all the law requires to necessitate a *voir dire*.

There are only a few cases close on their facts to the present one. Although the majority cites the cases as supporting the result it reaches, a more accurate assessment of the cases would conclude that none is sufficiently close to provide clear direction in the present matter. Despite the lack of definite signposts in the decided cases, the considerations outlined above compel the conclusion that there was a reasonable likelihood that petitioner was not tried by a fair and impartial jury. The contrary contention simply denies reality.

The position set forth here does not require that in every case where jury prejudice is alleged, appellate courts should freely order new trials. Rather, it reaffirms what is an eminently sound position, that where the defendant has shown facts which establish a reasonable likelihood that the jury may be prejudiced, the trial judge must permit the defendant to inquire as to the claimed prejudice on *voir dire*. Here, if *voir dire* had been allowed, the current problem would not have arisen. Quite possibly the jurors from the earlier case would have shown freedom from prejudice and the case would have proceeded free from a persistent, continuing, nagging doubt. Alternatively, one or more jurors would have displayed prejudice and been excused, to be replaced by an objective person or persons. Again the case could have proceeded without the unfortunate remark of a judge in the earlier case hanging over the proceeding. As the majority acknowledges "[t]he better practice would have been for the trial judge to prevent the *Richards* jurors from sitting in Wells's trial." Slip op. at 476.

By contrast, the standard adopted by the majority, relying entirely upon cases where a full record was developed through *voir dire*, creates an unfair dilemma for criminal defendants. The majority requires a defendant to prove that his jury was prejudiced and at the same time removes from his hands all opportunity to do so.

Also disturbing is the majority's willingness to assume that the defendant was not prejudiced without the benefit of any evidence to that effect. The majority's willingness blindly to assume that jurors have not been biased is both a miscarriage of

**484**

justice and a practice highly inappropriate for an appellate court, which of necessity must base its decisions on an adequate factual record.

I respectfully dissent.