NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1827
_____

UNITED STATES OF AMERICA

v.

JONATHAN BATTLES,
                              Appellant

_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(District Court No. 2-09-cr-00074-001)
District Judge: Hon. Cynthia M. Rufe
_____

Submitted under Third Circuit LAR 34.1(a)
February 12, 2013

Before: HARDIMAN and ALDISERT, Circuit Judges, and STARK,[*] District Judge.

(Filed: February 28, 2013 )

_____

OPINION OF THE COURT
_____


STARK, District Judge.

_____

[*] Honorable Leonard P. Stark, Judge of the United States District Court for the District of Delaware, sitting by designation.

In this criminal appeal, Jonathan Battles challenges his conviction and sentence, each on multiple grounds. We will affirm.

I

As we write principally for the parties, our discussion of the background facts is limited to that which is most pertinent to an understanding of the issues we must resolve.[1]

On February 5, 2009, a grand jury in the Eastern District of Pennsylvania indicted Battles on one count of conspiracy to commit bank fraud, a violation of 18 U.S.C. § 371, and one count of bank fraud, in violation of 18 U.S.C. § 1344 ("Indictment"). Also charged in the same Indictment were Angelique Torres and Tamika Booker.

Both counts arose from a scheme, engineered by Battles, in which Torres stole checks written by her employer, the City of Arlington, Texas, and sent them to Battles. Battles, in turn, gave the stolen checks to Booker to deposit in bank accounts Booker opened at Commerce Bank in Philadelphia. Torres and Booker did not know one another; Battles had relationships with both women.

Torres and Booker pled guilty. Battles chose to go to trial. At his trial, Torres testified for the government. Among other things, Torres explained that she had met Battles through a dating website. She identified the phone numbers, addresses, and email information she used in communications with Battles. She explained that Battles also visited her in Texas with some regularity, including on specific dates she verified. At

---

[1]We view the facts in the light most favorable to the government. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).

some point, Battles asked Torres if she would be willing to take checks from Arlington and send them to him, and Torres agreed to do so. Eventually, Torres sent Battles five checks she stole from Arlington – four payroll checks, intended for former employees of Arlington, and one check to a vendor that had provided services to the City – having a total value of $169,494. These five checks are specifically identified in the Indictment and are dated between April and June 2007.

Torres further testified that in November and December 2007 she stole an additional eight vendor checks from the City of Arlington, which had a value of $708,682. Torres explained that she took these checks because Battles told her that he needed more money. She did not, however, send or give Battles these checks. Instead, they were retrieved from her bedroom on December 19, 2007, when law enforcement searched her home.

Earlier on December 19, Arlington police officers had confronted Torres at work and asked her to come to the police station for questioning. As she drove herself to the station, Torres called Battles, who told her not to tell the police about his involvement, to identify him by another name, and to delete phone messages and contact information she had for him. Consistent with Battles' request, Torres lied to the Arlington police, including by denying stealing checks and by giving a false name for Battles. After further interrogation, however, Torres changed her story, admitted her role in the fraudulent scheme, and identified Battles.

Ultimately, Torres was interviewed three times. Although all three interviews were video recorded, prior to trial the government did not produce any of the three videos

3

to Battles. Instead, the government provided Battles only with written summaries of the first (December 19, 2007) and last (January 22, 2008) of the interviews.[3] The government did not know about the intervening interview (January 18, 2008).

On May 5, 2010, following a three-day jury trial, Battles was convicted on both counts. Battles then filed a "Motion for Relief from Verdict" and supplemental memoranda, alleging that the government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). The District Court held hearings on the motion on November 4, 2010 and April 20, 2011.

On January 10, 2012, the District Court issued a detailed Memorandum Opinion and Order, denying Battles' requests for relief.[4] The District Court found no Brady violation, explaining that the written summaries Battles had prior to trial of two of Torres' interviews "provided ample material with which the defense could challenge Torres's credibility, and Torres's lies and omissions were explored both in Torres's direct testimony and on cross-examination." (25a) Thus, "none of the DVDs was material." Id.

The sentencing hearing was held on March 16, 2012. Battles objected to several portions of the presentence report ("PSR"), including the loss calculation, the

---

[3]The prosecutor had no recollection of seeing or turning over to Battles any videos and conceded, for purposes of Battles' post-trial motions, that they had not been produced.

[4]Battles sought to have his criminal judgment vacated and the Indictment dismissed with prejudice, barring a retrial.

4

enhancement for obstruction of justice, and the points added to his criminal history for a 1992 state court conviction. After hearing argument, the District Court overruled each of the objections. Battles was sentenced to 120 months imprisonment, which was within the applicable advisory range of 110-137 months under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").[5] This timely appeal followed.

## II

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III

We address below each of the grounds on which Battles attacks his conviction and sentence.

## A

Battles contends that the District Court committed plain error by instructing the jury on evidence that Battles had lied to law enforcement. Battles argues that this instruction "had no evidentiary foundation and tainted the prosecution." (Br. 9) The District Court instructed the jury, in pertinent part:

> You also heard the testimony of several law enforcement officers . . . .

---

[5]Specifically, by Judgment and Conviction Order entered on March 20, 2012, the District Court sentenced Battles to 60 months imprisonment followed by three years of supervised release for bank fraud and 120 months imprisonment followed by five years of supervised release for conspiracy. The sentences run concurrently. Battles is also required to pay $80,494 in restitution to TD Bank, the successor to Commerce Bank.

You heard testimony and argument that the defendant made certain statements outside of this courtroom to law enforcement authorities in which he claimed that his conduct was consistent with innocence and not with guilt.

The government claims that these statements are false. . . . If you find that the defendant made a false statement in order to direct the attention of law enforcement officers away from himself you may, but are not required to conclude that the defendant believed that he was guilty.

It is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his own innocence. You may not, however, conclude on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged.

You must decide whether or not the evidence as to the defendant shows that he believed that he was guilty and the significance, if any, to be attached to that evidence.

In your evaluation you may consider that there may be reasons fully consistent with innocence that could cause a person to give a false statement that he did not commit a crime.

Fear of law enforcement, reluctance to become involved, simple mistake, any of those may cause an innocent person to give such a statement or explanation.

Of course, the defendant did not testify nor did he present evidence in this case. All defendants have an absolute constitutional right not to testify or to present any evidence. . . .

(97-99a)

As Battles did not object to this jury instruction, our review is only for plain error.

See United States v. Olano, 507 U.S. 725, 731-32 (1993); Fed. R. Crim. P. 52(b).

Accordingly, Battles must demonstrate that there was error that was plain, i.e., "clear" or

"obvious," that "affects substantial rights," and which this Court should – in its discretion

6

– correct, because the plain error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 734.

We find no error, as there was sufficient evidentiary support for the instruction. See Wells v. Murray, 831 F.2d 468, 477 (4th Cir. 1987) (stating jury instruction requires evidentiary foundation); see also generally United States. v. McGill, 964 F.2d 222, 235 (3d Cir. 1992) (stating jury instructions are reviewed in "light of the evidence") (internal quotation marks omitted).

At trial, Deputy U.S. Marshal Roger Bomenblit testified that, on January 28, 2008, he spoke to Battles about co-conspirator Booker. Marshal Bomenblit was trying to find Booker. In response to the question as to when he had last seen Booker, Battles lied, saying it had been about two and one-half months. When Bomenblit pressed further, Battles "changed his story" and admitted that Booker had stayed with him "until three weeks prior to that interview." (93a)

Battles cites no authority for his suggestion that, in order to be probative of guilt, a defendant's false statement to law enforcement must be made at a time when the authorities are focused on the defendant himself.[6] When Bomenblit confronted Battles on January 28, 2008, Battles knew it had been more than a month since the City of

---

[6]Battles likewise cites no authority for his suggestion that if his statement to Bomenblit could not be the basis for a prosecution for perjury – because he quickly corrected it – then it also may not be the basis for the challenged jury instruction. See generally United States v. Urban, 404 F.3d 754, 782 (3d Cir. 2005) ("[T]here is no question that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt.") (internal quotation marks omitted).

7

Arlington police had first interviewed his other co-conspirator, Torres. Battles knew that he had engaged in criminal activity with Booker and that Booker might – if apprehended – implicate Battles in such criminal activity. The jury could reasonably have concluded that Battles lied to make it more difficult for law enforcement to find Booker and, hence, more difficult for authorities to learn, from Booker, about Battles' own criminal conduct. While the timing of Battles' lie to Bomenblit could appropriately be considered by the jury as it assessed the weight to give this evidence (as the District Court instructed the jury to do), the untruthfulness of Battles' statement provided an adequate basis for the challenged instruction.[7]

Battles contends that the jury instruction created "massive" potential for jury confusion because "the incident connected Booker and Battles in a time frame post-conspiracy." (Br. 13) He argues the jury might have mistakenly interpreted the instruction as permitting it to conclude that Battles was falsely protesting his innocence as to the Indictment charges, even though Bomenblit was investigating Booker as a fugitive. We disagree. The instruction properly directed the jury to give the testimony

_____

[7]Battles also faults the instruction for implying that the jury heard evidence that Battles lied to "several" law enforcement officers, when the evidence supports only a finding that he lied to Bomenblit. (Br. at 11) Even if the District Court erred in this respect, such an error could not, in this case, have affected Battles' substantial rights such as to require reversal. In fact, there was no error, as the District Court correctly instructed the jury that it "heard the testimony of several law enforcement officers" (i.e., Bomenblit, as well as Secret Service Special Agent Lisa Koerber), not that it heard testimony that Battles lied to "several" officers. Other references in the instruction to "law enforcement authorities" related to how the statements would be disseminated to multiple law enforcement authorities.

8

regarding Battles' lie to Bomenblit whatever, if any, weight the jury believed it deserved. To the extent any potential for confusion existed, it is not such as to "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (internal citations and quotation marks omitted).[8]

B

Battles next challenges the admission of a document he contends was hearsay. The document reported the results of a query in a database maintained by Commerce Bank reflecting transactions made in the Commerce "interactive voice response" ("IVR") system. As Battles did not raise this objection in the District Court – indeed, he stipulated to the admission of the IVR document – Battles must show plain error. See United States v. Butch, 256 F.3d 171, 180 (3d Cir. 2001).

Stephanie Commini, an investigative analyst for TD Bank (the successor to Commerce Bank) testified that Commerce kept, in the ordinary course of business, a database showing IVR transactions. Commini queried this database and found that someone calling from Battles' phone number attempted to access Booker's Commerce Bank account, and attempted to transfer funds, on April 19, 2007, two days after Booker had deposited a check stolen by Torres.

It is undisputed that Commerce maintained the IVR database in the ordinary course of business and relied on it in operating its business. See Fed. R. Evid. 803(6).

_____

[8]In his Reply Brief, Battles asks us to strike footnote 6 from the government's brief, as it references a police case summary which was not in the trial record. There is no need to strike as our resolution of this appeal does not depend on the footnote.

9

The spreadsheet admitted at trial depicted a small portion of the IVR database that was relevant to the issues being tried. That the spreadsheet excerpt was created for the purpose of litigation does not render it hearsay. See United States v. Fujii, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business.") (internal emphasis omitted). As Commini was familiar with the Commerce IVR system, she was a proper witness through which the government could introduce the business record. See United States v. Console, 13 F.3d 641, 656-57 (3d Cir. 1993).

Battles argues that "the document does not support the analyst's conclusion," characterizing Commini's testimony that Battles failed in his attempt to transfer funds as "baseless" and "conclusory." (Br. 17, 20) The record provides no basis for us to agree with Battles' conclusions as to the meaning of the document or of Commini's testimony. More importantly, neither Battles' criticisms, nor the record, provides a basis for us to find error in the admission of the document.

C

Battles contends that the government constructively amended the conspiracy count in the Indictment, violating his rights pursuant to the Grand Jury Clause of the Fifth Amendment. Battles believes the Indictment was constructively amended by the admission of evidence showing an online "chat" he had with Torres in October 2007 as well as the evidence that Torres stole Arlington checks in November and December

10

2007.[9]  In Battles' view, the conspiracy charged by the grand jury ended in July 2007, so the admission of evidence from after that date created a risk that he was convicted based solely on uncharged events occurring after July.

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged."  United States v. Daraio, 445 F.3d 253, 259-60 (3d Cir. 2006); see also United States v. Miller, 471 U.S. 130, 138-39 (1985).  The "key inquiry is whether the defendant was convicted of the same conduct for which he was indicted."  Daraio, 445 F.3d at 260 (internal quotation marks omitted).  "If a defendant is convicted of the same offense that was charged in the indictment, there is no constructive amendment."  United States v. Vosburgh, 602 F.3d 512, 532 (3d Cir. 2010).

The Indictment alleged that Battles, Torres, and Booker conspired to commit bank fraud by stealing and depositing Arlington checks "[f]rom on or about February 2, 2007, through **at least on or about July 6, 2007**."  (31a) (emphasis added)  Thus, the Indictment did not identify a termination date for the conspiracy charge.[10]  There is,

---

[9]Battles concedes that he did not object to admission of the November/December checks.  (Br. 2)

[10]By contrast, the bank fraud charge had an end date, alleging that the fraud occurred "[f]rom on or about March 2, 2007, through on or about July 6, 2007."  (34a)

11

therefore, nothing inconsistent between the Indictment charge and the admission of the October chat and the November and December checks.

In any event, evidence of a person's acts subsequent to the completion of a criminal offense may be illuminating as evidence of that person's prior acts. See United States v. Bergrin, 682 F.3d 261, 281 n.25 (3d Cir. 2012). Here, evidence of the continuing conspiratorial relationship between Battles and Torres after July 6, 2007 was probative of Battles' guilt. The government introduced travel records from American Airlines, which showed that Battles traveled to Dallas on November 7 and again on December 12, 2007. Torres testified that she and Battles continued to be in contact through the end of 2007. Just as there was no error in the admission of this evidence, so, too, there was no error in admitting the October chat or the November and December checks. See United States v. Somers, 496 F.2d 723, 744-45 (3d Cir. 1974) ("[P]roof of the acts charged on any date within the statute of limitations and before the return date of the indictment is sufficient to support a conviction.").

A variation between the trial evidence and the indicted charge is improper only if it modifies an element of the crime charged. See id. at 744; see also United States v. Duka, 671 F.3d 329, 352 (3d Cir. 2011). The essential elements of a conspiracy are an agreement to commit an act in violation of the law and an overt act in furtherance of the conspiracy. See United States v. Whiteford, 676 F.3d 348, 356-57 (3d Cir. 2012). Time is not an essential element of a conspiracy charge.

Battles further argues that the chat was hearsay that was never authenticated. The chat contained Battles' own statements, making it admissible as non-hearsay. See Fed.

12

R. Evid. 801(d)(2)(A). The chat was authenticated by Torres, who testified that she and Battles engaged in the chat on October 21, 2007, and by Sharon Warnke, who testified that she found the chat in an account belonging to Battles that was left open on a computer she had loaned Battles when he visited her in late 2007.

The government proved – through, among other things, Commerce Bank records, video from the bank's cameras, and Torres' testimony – that what occurred was precisely what the Indictment charged: Battles persuaded Torres to steal checks from Arlington, Torres mailed those checks to Battles, and Battles gave the checks to Booker to deposit in Commerce Bank accounts. Battles was convicted for the same conduct for which he was charged in the Indictment. There is no substantial likelihood that he was convicted of a different offense.[11] Accordingly, there was no constructive amendment and no error.

Based on the "chat" and check evidence, Battles also argues there was an impermissible variance between the Indictment and the trial evidence. A variance occurs "where the charging terms of the indictment are not changed but when the evidence at the trial proves facts materially different from those alleged in the indictment." Daraio, 445 F.3d at 259. A variance constitutes "reversible error only if it is likely to have surprised or has otherwise prejudiced the defense." Vosburgh, 602 F.3d at 532 (internal quotation marks omitted). Here, there was no surprise; indeed, defense counsel discussed the chat

---

[11]In light of the compelling evidence of Battles' guilt in connection with the conspiracy as charged, we find no substantial likelihood that the jury viewed the chat as evidence of a second, separate, uncharged conspiracy – involving stolen invoices – for which the jury convicted Battles. (Br. 24-25)

13

with the trial judge prior to trial. As the evidence, taken in the light most favorable to the government, supports a conviction on the single conspiracy charged in the Indictment, Battles has shown no unfair prejudice. See United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989) (stating no impermissible variance occurs when, viewing evidence in light most favorable to government, reasonable jury could have found existence of same conspiracy as alleged in indictment). We find no impermissible variance.

D

The government failed to produce to Battles videotapes of any of the three interviews the City of Arlington police conducted with Torres, the government's principal trial witness. Battles contends that the government's failure violated his rights under Brady v. Maryland, 373 U.S. 83, 87 (1963), Giglio v. United States, 405 U.S. 150 (1972), the Jencks Act, 18 U.S.C. § 3500, and Fed. R. Crim. P. 26.2.

We review the District Court's findings of fact regarding an alleged violation of the government's constitutional disclosure obligations for clear error. See United States v. Pelullo, 14 F.3d 881, 886 (3d Cir. 1994). We review the District Court's conclusions of law de novo. See United States v. Thornton, 1 F.3d 149, 158 (3d Cir. 1993). We accord deference to the District Court's determination that non-disclosed information was not material. See id.; see also United States v. Pflaumer, 774 F.2d 1224, 1230 (3d Cir. 1985).

The government is required to produce to a criminal defendant all exculpatory evidence, including evidence that could be used to impeach the testimony of a government witness, when the reliability of that witness may be determinative of a

14

defendant's guilt or innocence.  See Brady, 373 U.S. at 87; Giglio, 405 U.S. at 153-55.

Mandatory disclosure of such materials by the government is intended to ensure that a

"miscarriage of justice" does not result from suppression of evidence favorable to the

accused.  See United States v. Bagley, 473 U.S. 667, 675 (1985).  Hence, the focus is on

the fairness of the criminal trial, not on whether the prosecutor acted in good faith, see

Brady, 373 U.S. at 87, or whether defense counsel was diligent in obtaining exculpatory

evidence, see Kyles v. Whitley, 514 U.S. 419, 432-34 (1995) (stating Brady obligation

exists even in absence of defense request).

A valid Brady claim "contains three elements: (1) the prosecution must suppress

or withhold evidence, (2) which is favorable, and (3) material to the defense."  United

States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991).  Evidence is considered exculpatory

and, therefore, "material," "only if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different."

Bagley, 473 U.S. at 682; see also Kyles, 514 U.S. at 433.  A "reasonable probability" is a

probability sufficient to undermine confidence in the outcome of the trial.  See Bagley,

473 U.S. at 682.  This same materiality standard applies to exculpatory and impeachment

material.  See id. at 676.

Arlington police interviewed Torres on three occasions.  For the first interview, on

December 19, 2007, the government produced a written summary, which noted that the

interview had been videotaped.  Battles' attorney did not request a copy of the video and

the government did not produce it.  For the second interview, on January 18, 2008, the

government did not produce anything, because the government did not have either a

15

summary or a recording. For the third interview, on January 22, 2008, the government produced a written summary, which did not note that the interview had been videotaped. Battles' attorney did not seek pre-trial production of the video of this interview.

The videos of the three Torres interviews run to a total of more than five hours. In his briefing, Battles delineates in detail the contents of the videos. (Br. 30-41) The District Court, after viewing the videos, carefully compared their contents to the substance of what was disclosed in the written summaries of the December 19, 2007 and January 22, 2008 summaries that were produced to Battles prior to trial.

Having reviewed the record, we agree with the District Court that the undisclosed videos were not material.[12] In United States v. Walker, 657 F.3d 160, 186, 188 (3d Cir. 2011), we held that "undisclosed Brady material that would have provided a **different** avenue of impeachment is material, even where the witness is otherwise impeached," but "it is only those new avenues of impeachment that sufficiently undermine confidence in the verdict that will make out a successful Brady claim." (Internal quotation marks omitted) We have elsewhere held: "Where the district court applies the correct legal standard, its weighing of the evidence merits deference from the Court of Appeals, especially given the difficulty inherent in measuring the effect of a non-disclosure on the course of a lengthy trial covering many witnesses and exhibits." Thornton, 1 F.3d at 158 (internal quotation marks omitted). Furthermore, "impeachment evidence, if cumulative of similar impeachment evidence used at trial . . . is superfluous and therefore has little, if

---

[12]Counsel offered to make the videos available to us, but we find it unnecessary to view them, given the conclusions we have reached from the materials already before us.

16

any, probative value." Walker, 657 F.3d at 187 (internal quotation marks and emphasis omitted); see also United States v. Hill, 976 F.2d 132, 134-35 (3d Cir. 1992) (finding no Brady violation where government produced witness statements of agents but not grand jury transcripts).

Battles has not demonstrated that the videos would have provided him a different avenue for impeachment of Torres beyond those that were already available to him based on the evidence disclosed to him prior to trial, principally the written summaries of Torres' first and third interviews. The District Court accurately described the summary of the December 19 interview as follows:

> The police summary of the December 19 interview is detailed, describing how over the course of the interview, Torres contradicted herself, was evasive, and lied to detectives about knowing Battles, her relationship with him, and the nature and extent of her interactions with him. It reports that Torres initially gave a false name for an acquaintance in Philadelphia before eventually admitting that she knew Battles and that they had a relationship.
>
> The summary also describes how Torres lied about whether she knew about or was involved in the theft of checks, before eventually admitting that she had taken five checks. The summary notes that during the interview, Torres denied having any additional checks, but that a later search of Torres's home uncovered a total of eight municipal checks and two additional vendor checks.

(16-17a) (internal footnotes omitted); see also SA424 (summary of December 19 interview, stating: "Throughout the interview, Torres was very evasive and this detective would confront her on the discrepancies in her responses at which time she would provide[] additional information.").

17

At trial, Torres testified in her direct examination that she agreed to plead guilty to conspiracy and bank fraud, and did so in hopes of receiving a "lighter sentence." (SA121-23)  She expressly acknowledged that she had "lied" to the police about whether she knew Battles and whether she had stolen the checks.  (SA144)  On cross-examination, Battles' counsel questioned Torres further about being interviewed by the Arlington police, and had her confirm again that she was "not initially forthcoming" but instead was "revealing as [she] went through the conversation."  (SA172, 180)  Counsel further established that, even after admitting to taking some checks, Torres continued to conceal that she had stolen others (that were eventually found in her home), and that Torres had lied to police about Battles' name.  (SA180-81)  Counsel also questioned Torres about her guilty plea.  (SA176)  Finally, in response to one of counsel's questions, Torres once again admitted unequivocally, "I did not tell the Arlington Police Department the truth."  (SA182)

Battles identifies nothing in the three videos that would have provided him an additional avenue for cross-examining Torres that he did not already have available to him at the time of trial.  Further questioning of Torres on her lack of candor in her interactions with the Arlington police might have been effective, but it also would have been cumulative.  More importantly, particularly given that "virtually every aspect of Torres's testimony was corroborated by documentary evidence and the testimony of other witnesses" (21a), there is no reasonable probability that disclosure of the videos prior to trial would have changed the outcome of the trial.  See Johnson v. Folino, __ F.3d __, 2013 WL 163841, at *9 (3d Cir. Jan. 16, 2013) ("Suppressed evidence that would be

18

cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for <u>Brady</u> purposes.").

Battles observes that the January 22, 2008 video shows Torres, at times, looking in a notebook, which Torres says in the video her sister helped her prepare. Battles further notes that the government failed to produce prior to trial the envelope found in Torres' home – that is, the envelope containing the additional stolen Arlington checks from November and December 2007 – which had Torres' sister's name on it. While Battles did not know about the notebook prior to trial, he did know of the envelope, which was discussed at trial. In fact, Battles' counsel asked that the envelope be produced, and the prosecutor said he would look into it, but Battles did not follow up. Hence, even without knowledge of the notebook, defense counsel was aware of an "avenue" for impeaching Torres based on suspicions of her sister's involvement in the conspiracy. Counsel, however, chose not to pursue this impeachment.

In the end, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles</u>, 514 U.S. at 434; <u>see also</u> <u>Pelullo</u>, 105 F.3d at 123-24 (stating cumulative effect of <u>Brady</u> and <u>Giglio</u> violations may result in verdict unworthy of confidence). Here, Battles points to nothing in the record to give us reason to lack confidence in the jury's verdict that he was guilty as charged.

For the same reasons, we reject Battles' contention that the non-disclosure of the videos was a violation of Giglio, the Jencks Act, or Rule 26.2. See Hill, 976 F.2d at 142 ("When undisclosed Jencks material is merely repetitious and/or cumulative of evidence available to the defendant at trial, the Jencks error can be deemed harmless, especially where the undisclosed pretrial statements do not contain impeachment material that would add to an already effective cross-examination of a key witness."); see also United States v. Milan, 304 F.3d 273, 288 (3d Cir. 2002) (finding no Giglio violation based on non-disclosure of tapes).

E

Battles further contends that the government's failure to produce the three videos violated his rights under the Confrontation Clause of the Sixth Amendment. Our review is plenary. See United States v. Mitchell, 145 F.3d 572, 576 (3d Cir. 1998).

"[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (internal emphasis omitted). "Confrontation Clause claims . . . should be considered in relation to the potential effect of the foreclosed cross-examination on the jury's evaluation of a particular witness." United States v. Chandler, 326 F.3d 210, 219 (3d Cir. 2003).

As already explained, the videos of the three interviews fail to provide any new avenues for impeachment of Torres that were not already available to Battles from the materials that were disclosed prior to trial, including the written summaries of the first and third interviews. We agree with the government that "Battles does not identify a

20

single question that his attorney could have asked Torres, had counsel been in possession of the videotapes, which was not asked." (Gov. Br. 48) Since Battles had an opportunity for effective cross-examination of Torres, the Confrontation Clause was not violated.

F

Battles also challenges his sentence, asserting that the District Court committed error in its application of the Guidelines. We apply plenary review to the District Court's interpretation of the Guidelines and review findings of fact for clear error. See United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc); United States v. Napier, 273 F.3d 276, 278 (3d Cir. 2001) (addressing loss calculation); United States v. Powell, 113 F.3d 464, 467 (3d Cir. 1997) (addressing obstruction); United States v. Audinot, 901 F.2d 1201, 1202 (3d Cir. 1990) (addressing criminal history calculation).

Battles first contends that the District Court erred in finding that the intended loss was between $400,000 and $1,000,000, leading to an increase of 14 in his offense level. The District Court's finding was based on adding the value of the five checks listed in the Indictment, which totaled $169,494.94, to the value of the eight additional November and December 2007 checks found in Torres' bedroom, which totaled another $708,682.15, for an overall intended loss of $878,117.09. In Battles' view, the District Court should have limited the loss calculation to just the five checks listed in the Indictment, which would have reduced his offense level by four points.

The checks found during the search of Torres' home in December 2007 were properly treated as relevant conduct. The District Court did not clearly err in concluding the thefts of these checks were acts Battles "aided, abetted, counseled, commanded,

21

induced, procured, or willfully caused" and were also "reasonably foreseeable acts . . . of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. 1B1.3(a)(1)(A) & (B); see also United States v. Siddons, 660 F.3d 699, 705 (3d Cir. 2011) (including as relevant conduct acts that were part of same course of conduct or scheme occurring beyond date of charged fraudulent mailing); United States v. Stephens, 198 F.3d 389, 390-91 (3d Cir. 1999) (including in loss calculation, as relevant conduct, acts occurring after expiration of statute of limitations).

Torres testified that when Battles visited her in Texas in December 2007, they discussed her stealing additional checks – which he said he needed for his business – and she did take more checks. Torres still had the checks she stole in late 2007 when, on December 19, 2007, the police searched her home; her testimony was inconsistent on whether she intended to send the November/December checks to Battles. However, given her testimony that she stole the checks after Battles told her he needed them, it was not clear error for the District Court to find that Torres' theft of the November/December checks from Arlington was part of the same course of conduct and common scheme as her earlier theft of checks.

Next Battles challenges the addition of two offense levels for obstruction of justice, pursuant to U.S.S.G. 3C1.1. These two points were based on the discussions Battles had with Torres in December 2007 before and after Torres' first interview with the Arlington police. Torres testified that, as she was driving to the police station, Battles told her not to mention his name, made up a false name for her to use, and urged her to delete all of his texts and phone numbers from her phone. He also told her to say that she

22

met co-conspirator Booker in a chat room. In the later conversation, Battles asked Torres if she had told the police anything, and she lied and said she had not.

The District Court did not clearly err in concluding that Battles' efforts to influence what Torres told the Arlington police and to encourage her to destroy evidence pointing to him constituted an attempt to obstruct the administration of justice with respect to the investigation of the offenses of conviction. See United States v. Jenkins, 275 F.3d 283, 291 (3d Cir. 2001) (holding that attempt to obstruct state prosecution constitutes obstruction of justice in federal matter provided that, as here, there is "nexus between the defendant's conduct and the investigation, prosecution, or sentencing of the federal offense").

Finally, Battles contends that his criminal history category should be V instead of VI, as the District Court incorrectly gave him three criminal history points, instead of zero or one point, for a 1990 conviction he received in the Montgomery County (Pennsylvania) Court of Common Pleas for theft and forgery.[15] While we agree with the District Court's interpretation of the Guidelines as well as its calculation, some extended discussion is necessary to explain why.

On June 21, 1989, Battles was arrested and charged with theft by unlawful taking and forgery ("Montgomery Offense"). This Montgomery Offense arose from Battles'

---

[15]The District Court found Battles had a total of 14 points, placing him in criminal history category VI. If, instead, the Montgomery theft and fraud conviction is accorded zero or one point, Battles would have just 11 or 12 points, which would place him in criminal history category V. Holding his offense level constant at 25, Battles' advisory Guidelines range would be reduced from 110-137 down to 100-125 months.

23

efforts to use another person's identity to purchase a $60,000 BMW automobile.  On April 10, 1990, Battles pled guilty to the Montgomery Offense ("Montgomery Conviction").  Then Battles failed to report for his presentence interview on the Montgomery Conviction, forging his own death certificate in an apparent attempt to excuse his non-appearance.

On January 10, 1992, Battles was arrested on a federal charge of use of an unauthorized access device, for which he was prosecuted in the Eastern District of Pennsylvania ("EDPA Offense").  Battles pled guilty to the EDPA Offense on March 10, 1992 ("EDPA Conviction").  On April 8, 1992, Battles was sentenced to 18 months imprisonment on the EDPA Conviction ("EDPA Sentence").

On April 30, 1992, Battles was arrested again relating to the Montgomery Conviction, for which he had still not been sentenced.  Battles was finally sentenced on the Montgomery Conviction on July 21, 1992, receiving "not less than eight nor more than 23 months imprisonment and a three-year term of probation" ("Montgomery Sentence").  (PSR ¶ 53)  Battles was given credit for time served from January 10 to March 9, 1992 and from April 30 to July 21, 1992.  The Montgomery judge allowed Battles to serve the remainder of his sentence on the Montgomery Conviction at FCI Otisville, where Battles was then also serving his EDPA Sentence.  On September 13, 1992, Battles was "paper-paroled" from his Montgomery Sentence to his EDPA Sentence.  (PSR ¶ 56)

Battles was released from federal custody on the EDPA Sentence on June 21, 1993.  On August 6, 1993, he was again arrested.  On August 17, 1993, Battles was

sentenced in EDPA to 18 months imprisonment for violation of supervised release on his EDPA Sentence ("EDPA Violation Sentence").

On October 19, 1993, Battles came into local custody from federal custody. Then, on February 7, 1994, Battles was arrested in the Eastern District of Virginia and charged with three counts of bank fraud ("EDVA Offenses"). Battles pled guilty to the EDVA Offenses on April 15, 1994 ("EDVA Conviction"). On June 24, 1994, he was sentenced to 24 months imprisonment, "consecutively to any other sentence the defendant was serving" ("EDVA Sentence"). (PSR ¶ 60)

On December 5, 1994, Battles was found to be in violation of the parole and probation imposed as part of his Montgomery Sentence. Consequently, he was sentenced to "serve the balance of his back-time on the parole violation (16 months and 15 days) to run concurrently with a sentence of one to seven years imprisonment on the violation of probation" ("Montgomery Violation Sentence"). (PSR ¶ 56) Both portions of the Montgomery Violation Sentence were to date from October 19, 1993 – the date Battles came into local custody from federal custody.

On December 31, 1994, Battles was returned to federal custody, "prior to completing" the Montgomery Violation Sentence. Id. "As a result, the defendant was never paroled by the Pennsylvania Board of Probation and Parole, and neither the state sentence [i.e., Montgomery Sentence] nor the state parole term [i.e., Montgomery Violation Sentence] was served by the defendant." Id.

25

For this crime spree,[16] the District Court counted a total of nine criminal history points, consisting of three points each for the Montgomery Conviction, EDPA Conviction, and EDVA Conviction. Battles challenges the District Court's application of the Guidelines to the Montgomery Conviction. However, pursuant to Guidelines 4A1.1(a), 4A1.2(e)(1), and 4A1.2(k)(1), the District Court did not err. The Montgomery Conviction occurred within 15 years of the instant federal offense. The Montgomery Sentence plus the Montgomery Violation Sentence totaled more than one year and one month. Hence, three points were properly included in Battles' criminal history.

Battles contends that he did not really serve at least 13 months incarceration on his Montgomery Sentence and Montgomery Violation Sentence. Battles' contention is essentially that he received a suspended sentence in all but name for his Montgomery Conviction. Pursuant to U.S.S.G. 4A1.2(a)(3), "[a] conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § 4A1.1(c)," which would mean it could count for no more than one criminal history point. On this reasoning, Battles argues he should have received at most just one point, and not three points, for his Montgomery Conviction.

We do not agree. The record establishes that Battles was sentenced to greater than one year and one month on the Montgomery Conviction. His original Montgomery Sentence was "not less than eight nor more than 23 months imprisonment." To this is

---

[16]As the District Court observed, and as is obvious from this unfortunately lengthy explication of Battles' pertinent history, "part of this problem is that there are so many things going on."

26

added his Montgomery Violation Sentence, which was to "serve the balance of his back-time on the parole violation (16 months and 15 days) to run concurrently with a sentence of one to seven years imprisonment on the violation of probation." It is true that during most (if not all) of the times Battles was incarcerated, he was concurrently incarcerated for other convictions as well. However, there is no evidence to support Battles' contention that his Montgomery Sentence and Montgomery Violation Sentence were essentially suspended sentences.

Battles' reliance on decisions from two of our sister circuits is unpersuasive. See United States v. Hall, 531 F.3d 414, 416, 419 (6th Cir. 2008); United States v. Buter, 229 F.3d 1077 (11th Cir. 2000); see also United States v. Staples, 202 F.3d 992, 997 (7th Cir. 2000) ("With a suspended sentence, the offender may never spend a day in jail. The sentence hangs over his head as a way to ensure compliance with the terms of probation or other court orders. [By contrast,] [c]redit for time served evinces the court's determination that the offender must spend some time in jail but has already served that time, either awaiting trial or on some other offense. It is a way to avoid excessive or duplicative punishment but does not reflect the court's determination that this offense is so minor that no jail time is warranted."). Unlike Battles, the defendants in Hall and Buter had already finished serving the sentences against which they were given credit. Battles, by contrast, was given credit against federal sentences which he was still serving. See Hall, 531 F.3d at 420 (distinguishing between time served and concurrent sentences). The only reason that the amount of time Battles served solely on the Montgomery Conviction was so short was because he kept committing other crimes, not because the

27

Montgomery Sentence was suspended or the Montgomery judge felt prison time was unwarranted.

Battles had so many convictions that it turned out it took him longer to complete his federal sentences than it took to serve the state sentence. Under these circumstances, the concurrent sentences are counted separately unless they were imposed in related cases. See U.S.S.G. 4A1.2(a)(2); United States v. Davis, 929 F.2d 930, 934 (3d Cir. 1991). Battles does not argue – and there would be no basis to do so – that the Montgomery Conviction is in any way related to the conspiracy and bank fraud convictions he is appealing. Thus, again, the District Court did not commit error.

IV

For the reasons given above, we will affirm the District Court.